Henry T. McMILLAN et al.,
Plaintiffs-Appellees,

v.

ESCAMBIA COUNTY, FLORIDA et al.,
Defendants-Appellants.

Elmer JENKINS et al.,
Plaintiffs-Appellees,

v.

CITY OF PENSACOLA et al.,
Defendants-Appellants.

No. 78-3507.

United States Court of Appeals,
Fifth Circuit.

Feb. 19, 1981.

Richard I. Lott, County Atty., John W. Flemming, Asst. County Atty., Pensacola, Fla., for Escambia County.

Ray, Patterson & Kievit, Pensacola, Fla., for School Board.

Charles S. Rhyne, William S. Rhyne, Washington, D.C., for all defendants-appellants.

Don J. Canton, City Atty., Pensacola, Fla., for City of Pensacola.

J. U. Blacksher, Larry Menefee, Mobile, Ala., Kent Spriggs, Tallahassee, Fla., Jack Greenberg, Eric Schnapper, New York City, Edward Still, Birmingham, Ala., for plaintiffs-appellees.

Before COLEMAN, PECK * and KRAVITCH, Circuit Judges.

* Senior Circuit Judge of the Sixth Circuit, sitting by designation.

KRAVITCH, Circuit Judge:

These consolidated cases arise from an attack on the forms of government in the City of Pensacola and Escambia County, Florida. The County Commission, City Council and School Board are all defendants. The district court, after extensive hearings, found that the at-large election systems used to elect each of the three defendant bodies are unconstitutional.[1] We affirm in part and reverse in part.

## I. *Overview of Plaintiffs' Claim*

These class actions were filed simultaneously on March 18, 1977, by black voters of Pensacola and Escambia County. The plaintiffs alleged that the at-large systems for electing members of the area's three major governing bodies are unconstitutional as violative of their rights under the First, Thirteenth, Fourteenth and Fifteenth Amendments and are in violation of the Civil Rights Act of 1957, 42 U.S.C. § 1971(a)(1), the Voting Rights Act of 1965, as amended in 1975, 42 U.S.C. § 1973, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

The essence of the plaintiffs' complaints is that the at-large systems operate to preclude the black population, which comprises one-third of the city population[2] and one-fifth of the county population,[3] from electing a member of its own race to any of the three governing bodies.

The Board of County Commissioners is composed of five members who serve staggered four-year terms. Although they must run for numbered places corresponding to the districts in which they live, they are elected at-large by the voters of the entire county. Each major party is required to hold a primary in which only party members may vote. Candidates run at-large for numbered places in the primaries, and a majority vote is required for the party nomination. There is no majority vote requirement in the general election.

The School Board of Escambia County is composed of seven members who serve staggered four-year terms. Five of the members must reside in residential districts but two may reside anywhere in the county.[4] Otherwise, the election process for the School Board is the same as that for the County Commission.

The Pensacola City Council has ten members. Candidates must run for numbered places corresponding to the five wards, and must live in the corresponding ward. The election, however, is at-large. There are no primaries, but there is a majority vote requirement.

Since 1955, blacks have been candidates for the County Commission four times, for the School Board five times and for the City Council nineteen times. As of the date of trial, no black had ever been elected to either the County Commission or the School

1. These appeals proceeded in a piecemeal manner. After the district court held the three defendant bodies to be unconstitutional, but before a remedy was ordered, the defendants filed a notice of appeal. The district judge had expressed his belief that his order finding the systems unconstitutional was a final order, but certified it for interlocutory review in case he was in error.

   While that appeal (No. 78–3507) was pending but before it was set for oral argument, the district court entered its remedy order against the city council. The plaintiffs filed a notice of appeal from the remedy order which was docketed as 79–1633 and was consolidated with 78–3507 for oral argument. That appeal is being decided today in a separate opinion. *Jenkins v. City of Pensacola,* 638 F.2d 1249 (5th Cir. 1981).

   After the district court entered its remedy order for the city council, it entered remedy orders against the county commission and the school board. The school board chose not to appeal the order entered against it, but the county commission did appeal the remedy order. That appeal, 80–5011, was consolidated with 78–3507 and 79–1633 for oral argument and is being decided today in a separate opinion. *McMillan v. Escambia County,* 638 F.2d 1249 (5th Cir. 1981).

2. Blacks represent 23% of the registered voters in the City of Pensacola.

3. Blacks represent 17% of the county's registered voters.

4. The two seats without a residency requirement were added in 1976. 1976 Fla.Laws, ch. 76–356. This change is discussed in note 14, *infra.*

Board,[5] and only two blacks had been elected to the City Council. The two black City Council members had initially been appointed to the Council to fill vacant seats and were then successful in their bids for reelection.

The plaintiffs argue that because of racially polarized voting,[6] and because of the race. These returns, combined with regression statistics on all precincts, showed that whenever a black challenges a white for countywide office, a significant majority of the whites who vote will consistently vote for the black's opponent. Sixty percent or more of the whites will do so in most cases. There were some differences in the testimony of plaintiffs' experts and defendants' expert. For example, the defendants' experts' approach to statistical analyses of polarization was somewhat different from that of plaintiffs' expert. Nonetheless, both found racial polarization in most, if not all, elections in which blacks ran.

Even though turnout among black voters is as high as that among white when black candidates run (it is regrettably low for both races), and black voters vote almost unanimously for the black candidates, black candidates cannot attain a majority of the votes in the county because of the numerical inferiority of blacks combined with the white bloc vote. Several prominent white politicians acknowledged this fact.

The situation is much the same respecting the city. Although blacks constitute 33% of the city's population and 23% of its registered voters, with two noteworthy exceptions, black candidates have been denied office by the white bloc voting. All city election returns since 1955 were analyzed in the same manner as the countywide returns and again it was shown that most white voters showed a consistent preference for white candidates over black candidates resulting in consistent losses and frustration for the minority candidates....

There have been only two exceptions to the white bloc vote in city elections. Two blacks, Dr. Spence and Hollice Williams, have been appointed by the council to fill vacant council seats and thereafter were both winners in their bids for reelection. The evidence strongly suggests that the absence of the white bloc vote against these two candidates is due to the fact that both were chosen and thereafter received public and private white political support. Indeed, one of the two had run for the council prior to his appointment and was then soundly defeated by the usual white bloc vote. This effect of endorsement by community leaders is a common political phenomenon which is called "cuing." *See* V. O. Key, *The Responsible Electorate.*

Not all whites vote against blacks. In every race blacks have received some white

5. After the trial in this case, Dr. Vernon McDaniel, a black educator, was elected to the school board.

6. Expert statistical evidence was presented which showed a very high correlation between the percentage of blacks in a precinct and the number of votes a black candidate receives in that precinct. The district court discussed the racial polarization of voting at length.

There is in Escambia County a consistent racially polarized or bloc voting pattern which operates to defeat black candidates. There is in the county an active Ku Klux Klan which has run at least one candidate for office and obtained a significant number of votes. More importantly, however, there is an even larger bloc of white voters who, like almost all black voters, consistently vote for the candidate of their race whenever black candidates face white candidates.

The complete record of county elections since 1955 was brought before the court. The first black person to run for a countywide office was John Reed, who was a candidate for the Escambia County Commission in May, 1966. He failed to make the runoff in the Democratic Primary. The $R^2$ coefficient of the correlation between Mr. Reed's vote returns and race was 0.98. The first black person to seek election to the Escambia County School Board was Otha Leverette in 1970. Rev. Leverette got the Democratic Party nomination without opposition; no other candidates qualified for this place. Some efforts were made to hide the fact he was black until the qualification date passed. But Leverette was beaten in the general election by a white Republican candidate, Richard Leeper. It was the first time in the modern history of Escambia County that a Republican had won any countywide office. Mr. Leeper received 22,523 votes even though there were at that time only 7,268 Republicans registered. There were 67,297 whites and only 13,037 blacks registered to vote. The $R^2$ coefficient for the correlation between Leverette's vote and race was 0.76, indicating a severely racially polarized vote. Richard Leeper had received only 10,712 votes in his race against a white Democratic candidate, Kirkland, in the 1966 school board general election.

This pattern of black candidates losing in racially polarized elections continues to the present....

[Election] returns and regression statistics were analyzed by political scientists. The analyses focused upon voting returns from precincts which were 95% or more of one

at-large system of elections, the votes of blacks in Pensacola and Escambia County are being diluted. In essence, their argument is that although blacks comprise a significant minority of the area, they will never be able to elect members of their race to the governing bodies, and hence, their votes are worth less than those of their white counterparts. This claim has been presented to this court previously; *see, e. g., Cross v. Baxter*, 604 F.2d 875 (5th Cir. 1979); *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978); *Blacks United for Lasting Leadership v. Shreveport*, 571 F.2d 248 (5th Cir. 1978); *NAACP v. Thomas County, Georgia*, 571 F.2d 257 (5th Cir. 1978); *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), and, more recently, to the Supreme Court in *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980).

It should be noted that there is no allegation of any actual impediment to blacks voting, such as a poll tax or racially motivated gerrymandering of municipal boundaries. *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).[7] Rather, the issue here is limited to a claim of vote dilution.

## II. *City of Mobile v. Bolden*

■ *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), was pending before the Supreme Court when these cases were argued; accordingly, we postponed decision in these cases pending the *Bolden* decision. After *Bolden* was announced, we requested supplemental briefs from the parties. As Justice White predicted, however, we still are somewhat "adrift on uncharted seas with respect to how to proceed." 446 U.S. at 103, 100 S.Ct. at 1519.

No view by the Supreme Court Justices commanded a clear majority. Mr. Justice Stewart, who authored the plurality opinion, joined by Justices Burger, Powell and Rehnquist, was of the view that a vote dilution claim, as opposed to an actual denial of the right to vote, is not a Fifteenth Amendment[8] claim at all, and that a Fourteenth Amendment claim had not been proven because the plaintiffs had not adduced adequate proof that the at-large election system constituted intentional discrimination against blacks, either in its inception or operation.

Although Justice Stevens considered a vote dilution claim to be a proper Fifteenth Amendment claim, he would require a plaintiff to prove that the system complained of is either "totally irrational or entirely motivated by a desire to curtail the political strength of the minority." 446 U.S. at 90, 100 S.Ct. at 1512.

In dissent, Justices Brennan, White and Marshall, for different reasons and in vary-

support. But the city, like the county, is, by and large, a race conscious society. There is an established pattern of sufficient polarized voting to regularly defeat black candidates. White candidates do actively seek the votes of blacks. The studies of voter turnouts indicate, however, that when whites run against whites, black voter turnout drops, indicating a lack of interest by blacks in the candidates. Defendants' expert admitted that this may indicate that blacks view the choice of white candidates as irrelevant to their interests. Dist.Ct.Order, pp. 11–15.

7. In fact, the district court found that "[n]o impediments are thrown in the way of blacks to register and vote." Dist.Ct.Order, p. 10.

8. Justice Stewart in *Bolden* gently chided this court and the district court for failing to address the complainant's statutory claim under § 2 of the Voting Rights Act of 1965. The plurality went on to hold, however, that Section 2 of the Voting Rights Act does no more than elaborate on the Fifteenth Amendment. Under the plurality view, the *Bolden* plaintiffs had no valid Fifteenth Amendment claim and thus could not benefit from § 2 of the Voting Rights Act, either.

The plaintiffs here have urged this court to hold that there is an implied private cause of action under the Voting Rights Act and that they made out a case. Assuming there is a private cause of action and accepting the plurality opinion on the scope of § 2 (none of the other opinions addressed the issue), the plaintiffs cannot succeed under § 2 unless they can succeed under the Fifteenth Amendment. For a discussion of the viability of the Fifteenth Amendment in vote dilution cases, see note 9, *infra*.

ing levels of vehemence, disagreed with the plurality that discriminatory purpose had not been shown in this case. Justice Marshall, joined by Justice Brennan, went further, arguing that an approach based on motivation is unworkable, and that proof of discriminatory impact alone should be sufficient. Justices White and Marshall both viewed the *Bolden* claim as a legitimate Fifteenth Amendment claim. Justice Brennan took no position on this.

Justice Blackmun assumed that if Justice Stewart is correct that discriminatory purpose must be shown, the evidence would support a finding of intent. He concurred in the result, however, because he disagreed with the remedy ordered by the district court.

Because no one analysis captured five Justices, we must determine the view with which a majority of the Court could agree. There were five clear votes (Stewart, Burger, Powell, Rehnquist and Stevens, JJ.) against the proposition that discriminatory impact alone is sufficient in vote dilution cases. Accordingly, to win a majority of the Court, in addition to impact, discriminatory purpose of some sort must be proven. Justice Stevens articulated the most conservative opinion on the extent to which such purpose must be shown. Because no other Justice concurred in his opinion, that discriminatory purpose must be the *only* purpose, we reject that analysis. Instead, we adopt Justice Stewart's opinion, though it commanded only four votes. If, in addition to impact, a discriminatory purpose exists in the enactment or operation of a given electoral system, all members of the Court save Justice Stevens agree that that system is unconstitutional.[9]

**III. Do the At-Large Electoral Systems Here Exist Because of Purposeful Discrimination?**

*Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), teaches us that an inquiry into legislative purpose is not an easy one. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266, 97 S.Ct. at 564. The Court suggests several possible evidentiary sources for such a determination. Among them are: (1) the historical background of the action, particularly if a series of actions have been taken for invidious purposes; (2) the specific sequence of events leading up to the challenged action; (3) any procedural departures from the normal procedural sequence; (4) any substantive departures from normal procedure, i. e., whether factors normally considered important by the decisionmaker strongly favor a decision contrary to the one reached; and (5) the legislative history, especially where contemporary statements by members of the decisionmaking body exist. 429 U.S. at 267–68, 97 S.Ct. at 564.

The Stewart opinion in *Bolden* held that the so-called *Zimmer* factors regarding discriminatory impact (*see Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976)) were insufficient, standing alone, to support a finding of discriminatory purpose. Fortunately, the district court below correctly anticipated that the *Arlington Heights* requirement of purposeful discrimination must be met, and thus made explicit findings concerning intent in addition to and apart from its *Zimmer* findings. Accordingly, there is

**9.** Here, as in *Bolden*, the plaintiffs' complaint alleges violations of the Fourteenth and Fifteenth Amendments. Because Justices Brennan and Blackmun expressed no view as to the appropriate amendment under which to analyze a vote dilution claim, the majority view is unknown. Three Justices indicated this is a proper Fifteenth Amendment claim (Stevens, White and Marshall, JJ.); but the four Justice plurality opinion indicated it is not. We adopt the plurality view that vote dilution violates only the Fourteenth Amendment. Accordingly, the plaintiffs cannot succeed under either the Fifteenth Amendment or § 2 of the Voting Rights Act. *See* note 8, *supra*.

no need to remand the case for a determination of whether purposeful discrimination exists. *See Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 272–73, 97 S.Ct. 555, 567, 50 L.Ed.2d 450 (White, J., dissenting).

### A. *The County Commission*

■ The at-large system for electing county commissioners is mandated by a 1901 amendment to the Florida Constitution. Fla.Const., art. 8, § 5. There is considerable evidence that at about that time the white citizens of Florida adopted various legislative plans either denying blacks the vote entirely or making their vote meaningless. For example, Jim Crow laws were instituted in the early 1900's, the Democratic Party established the white primary [10] in 1900, and there was widespread disfranchisement of blacks.[11]

Although many actions in the early 1900's had a clear invidious purpose, this court held in *McGill v. Gadsden County Commission*, 535 F.2d 277 (5th Cir. 1976), which also involved an at-large system mandated by the 1901 amendment to the Florida Constitution, that no racial motivation was behind the amendment. This, according to *McGill* and Dr. Shofner, the plaintiff's expert historian, is because there was such widespread disfranchisement of blacks by that time that they did not represent a political threat. Thus, relying upon *McGill* as reinforced by the conclusions of Dr. Shofner, the district court held that the at-large system for electing county commissioners was not adopted for discriminatory purposes. Based upon the evidence, this finding of the district court was not clearly erroneous and supported the court's conclusion.

Although the at-large system did not have its genesis in a purposeful attempt to exclude blacks from the political process, under the Stewart analysis in *Bolden*, invid-

ious purpose in the operation of the plan will also invalidate it. 446 U.S. at 65, 100 S.Ct. at 1499. The district court held the at-large system for electing county commissioners is being perpetuated for invidious purposes. According to the district court, evidence of such an intent can be found in the fact that the County Commission has twice rejected the recommendations of its own charter government committees that the county change to single-member districts.

Four county commissioners testified at trial that race did not motivate their refusal to submit the issue of single-member districts to the electorate. Each stated that it was his personal belief that all voters of the county should be allowed to vote on each of the commissioners so the board would be more responsive to the needs of the community as a whole. Thus, the commissioners asserted "good government" reasons for perpetuation of the at-large system.

The district court held, however, that the purpose of perpetuating the present system was not legitimate.

In their post-trial memorandum, defendants admit that the rejection of the single-member district aspect of the charter proposal "reflects the commissioners' desire to maintain their incumbency." This was also the court's impression at trial. Each of these commissioners had been elected in countywide elections. They could not know how they would fare in single district elections. Yet it is apparent that in such elections one or more of them might be replaced by blacks.

To this court the reasonable inference to be drawn from their actions in retaining at-large districts is that they were motivated, at least in part, by the possibility single district elections might result in one or more of them being displaced in subsequent elections by blacks.

\* \* \* \* \* \*

single-member districts though the general election was conducted at-large.

---

**10.** Because the Democratic Primary was tantamount to the election, the exclusion of blacks from the primary effectively denied them the vote. Furthermore, the primary was conducted as a single-member district election. In essence, therefore, commissioners were elected in

**11.** *See generally* C. Vann Woodward, *The Strange Career of Jim Crow* (3rd ed. 1974).

That [the commissioners'] motivations may be selfish rather than malicious toward blacks does not alter the conclusion that their intent was to continue the present dilution of black voting strength. The present at-large election system for county commissioners is being maintained for discriminatory purposes.[12]

If the district court is correct in its conclusion that the at-large election system is being maintained for discriminatory purposes, then we must affirm its ultimate decision that the system is unconstitutional.

We have reviewed the testimony, however, and found no evidence of racial motivation by the county commissioners in retaining the at-large system. The trial court stressed defendant's statement in a post-trial memorandum that rejection of the charter proposal reflected the commissioners' desire to retain their incumbency. Retention of incumbency was never mentioned in the testimony. Moreover, in our view the desire to retain one's incumbency unaccompanied by other evidence ought not to be equated with an intent to discriminate against blacks *qua* blacks. The commissioners all testified that racial considerations played no role in their rejection of the charter proposal; the plaintiffs introduced no evidence to the contrary. The trial judge, of course, was entitled not to believe the commissioners' testimony; in the absence of contradictory evidence, however, disbelief of that testimony is not sufficient to support a contrary finding. *See Moore v. Chesapeake and Ohio Railway*, 340 U.S. 573, 576, 71 S.Ct. 428, 429, 95 L.Ed. 547 (1951). Therefore, the evidence falls short "of showing that the appellants 'conceived or operated [a] purposeful [device] to further racial discrimination.'" 446 U.S. at 66, 100 S.Ct. at 1499, *quoting Whitcomb v. Chavis*, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971).

B. *The School Board*

■ An at-large system for electing School Board members was established by state law in 1947. Fla.Stat. §§ 230.08, .10

(1975). The district court discussed the enactment of that law, and, applying the *Arlington Heights* criteria, found it to have been born from a desire to exclude blacks.

From 1907, 1907 Fla.Laws, ch. 5697, § 1, until 1945 there was clear support for single-member district elections for School Board members. During this period the primary elections for School Board members were conducted as single-member district elections, while the general elections were at-large. Because the all-white Democratic primary was tantamount to the election, from 1907 through 1945 the School Board was a de facto, if not de jure, single-member district body. Thus, in 1945 the clear policy of the citizenry of Escambia County was to favor single-member district elections for School Board members.

The 1945 decision in *Davis v. State ex rel. Cromwell*, 156 Fla. 181, 23 So.2d 85 (1945) (en banc), changed that, however, by declaring unconstitutional the white primary. In the very first legislative session following *Davis*, the legislature enacted statutes requiring at-large elections in both the primary, 1947 Fla.Laws, ch. 23726, § 7, and the general election, 1947 Fla.Laws, ch. 23726, § 9.

Looking at the change from single-member districts to at-large districts through *Arlington Heights* glasses, the conclusion that the change had an invidious purpose is inescapable. The specific sequence of events leading up to the decision mandates the conclusion that the citizens of Escambia County in 1945, with the demise of the white primary, were not going to take any chances on blacks gaining power and thus purposefully sought to dilute black voting strength through the use of an at-large system. Furthermore, the history of the county suggests a substantive policy which favored single-member districts for the election of School Board members. The abrupt, unexplained departure from that forty-year policy upon the heels of the white primary's demise justifies the district court's conclusion that the change was ra-

12. Dist.Ct.Order, pp. 30–31.

cially motivated. Accordingly, we concur in the statement of the district court that "[t]he evidence of discriminatory motives behind the at-large requirements of the 1947 system is compelling."

There is recent evidence of community awareness that the effect of the at-large system is to dilute the voting strength of blacks, and evidence that the dilutive effect will be capitalized on by the white majority to keep the School Board responsive to them. In 1975 the School Board took a position favorable to black interests on the question of whether the nickname "Rebel" should continue to be used at Escambia County High School.[13]

13. In 1973, black students intervened in the federal school desegregation suit to challenge the continued use of the nickname "Rebel" at Escambia County High School. White students and parents also intervened, but in defense of the nickname. This provoked considerable racial unrest in the school.

The district court enjoined further use of the "Rebel" name, *Augustus v. School Board of Escambia County*, 361 F.Supp. 383 (N.D.Fla. 1973), but the decree was modified on appeal. 507 F.2d 152 (5th Cir. 1975). The Fifth Circuit directed the district court to give the Board the opportunity to resolve the "Rebel" issue on its own. The Board's solution was to permit reinstatement of the nickname if there was a two-thirds majority vote in favor of doing so by the students at the high school. The matter was voted on and though a majority of the students voted in favor of reinstatement, it was not a two-thirds majority.

There was an angry reaction to the result and at least one attempt was made to influence a School Board member to vote to reinstate the nickname notwithstanding its failure to garner the support of two-thirds of the student body. The School Board did not capitulate, and its tenacity led to the "Board packing" episode, *infra*.

14. Changes in local governments are submitted to the Florida Legislature through the local delegation, generally based on a resolution by the local government. As a practical matter, local legislation will pass the legislature if it has the unanimous support of the local delegation. The proposed change is then submitted to the electorate in the form of a referendum. Discriminatory intent at any stage will infect legislation.

15. Generally, the change from a five-member to a seven-member school board is accompanied by a change from an elected to an appointed

The district court found that, in at least partial retaliation against the Board for its decision on the issue, the legislative delegation introduced a bill to increase the size of the Board to seven members, to change from an elective to an appointive school superintendent, and to reduce the salaries of Board members. The bill as introduced had the unanimous support of the local delegation.[14] As is required by state law, a referendum election was held to present the bill to the Escambia County electorate for approval. The proposals to increase the size of the Board and to reduce members' salaries passed overwhelmingly, but the provision to change to an appointed superintendent was defeated.[15]

superintendent. By separately submitting the two proposals, Escambia County is now the only county in Florida to have a seven-member board and an elected superintendent.

The School Board challenged the change to a seven-member board in court. The Florida Supreme Court held against the board, stating that "[t]he political motivations of the legislature, if any ... are not a proper matter of inquiry for this Court." *School Bd. of Escambia Co. v. Florida*, 353 So.2d 834, 839 (Fla.1977) (Hatchett, J., dissented).

As a general rule, a court does not inquire into the political motivations of legislators. The Supreme Court stated in *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252 at 265–66, 97 S.Ct. 555 at 563:

[I]t is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

(footnote omitted). It appears that the School Board did not argue in state court that the plan to increase its number had an invidious purpose, and thus, the Florida Supreme Court cannot be faulted for deferring to the legislature. In this court, however, the plaintiffs have made it painfully obvious that invidious purposes still motivate some of Florida's legislators' decisions. Such motivations were made not simply undesirable but unconstitutional over one hundred years ago. People have become more subtle and more careful in hiding their motivations when they are racially based. This makes the district court's inquiry in the first instance and ours on review more difficult. However, it

It is impossible to know unequivocally what motivated the electorate to vote to increase the size of the School Board. However, the fact that an earlier referendum for such an increase failed by a two-to-one margin, in conjunction with the racially charged atmosphere at the time of the second referendum, strongly suggests the vote was racially motivated. The district court described the situation as follows:

> The 1976 change in the school board's election system was avowedly to pack the board to make it more responsive to the white majority on a particular racially polarized issue.... This is a telling indication of the legislators' and community's recognition and use of the at-large system as a method of rendering black voters politically impotent to the desires of the white majority.

Dist.Ct.Order, p. 31.

The district court correctly held that the at-large system of electing School Board members was developed with a discriminatory purpose and is being utilized by the majority population for such a purpose. Accordingly, the district court was correct in holding the at-large system for electing School Board members unconstitutional.[16]

### C. City Council

In 1931 a council-manager form of government was instituted in Pensacola. As originally enacted, it provided for ten council members: five were elected from single-member wards and five were elected at-large but with a ward residency requirement.

In 1955, a black ran a very close race against a white for one of the single-member district seats. There was testimony that when the council next reapportioned the wards, it purposefully gerrymandered that ward to increase its percentage of whites. Furthermore, three years later, the council asked the local legislative delegation to change the law so that all the council members would run at-large. A man who served on the city council at that time testified at trial, and the following colloquy occurred:

> THE COURT: And the reason for that change [to 10 at-large seats] was what?
> A. Was because then we wouldn't have this hassle of reapportioning to keep so many blacks in this ward and so many whites in that ward and keep the population in balance as to race.

(R. XVI–605).

Other evidence of an invidious purpose in changing those five single-member district seats to at-large seats came in testimony by then-Governor Reubin Askew. In 1959, Askew was a first-term state representative from Escambia County. He testified that he did not have a discriminatory motive in supporting the change to all at-large seats, testimony which was credited by the district court. He further testified that though he was unaware of the council members' motives generally, he was aware that one council member had indicated the change was wanted to avoid a "salt and pepper council."

On the eve of the referendum election at which the change to all at-large seats was at issue, an editorial in the *Pensacola Journal* stated that there would be advantages to having all council members elected at-large. "One reason is that small groups which might dominate one ward could not choose a councilman. Thus, one ward

---

is obviously equally important to invalidate actions motivated by subtle, hidden invidious purposes as it is to do away with more blatant forms of discrimination.

**16.** The district court, in determining that the School Board election plan was being maintained for discriminatory purposes, stated that it considered *Zimmer* factors in conjunction with other evidence. *Zimmer v. McKeithen* has been invalidated by *Bolden* and any conclusion based solely on *Zimmer* factors would be erroneous. Here, however, the court's conclusion that the plan had been maintained for discriminatory purposes was based on other evidence, *i. e.*, the 1976 referendum, in conjunction with the *Zimmer* factors. Moreover, as regarding the School Board, a finding of discriminatory motive in maintaining the system is not necessary to invalidate it; the court's finding of discriminatory intent in the creation and discriminatory impact suffice to satisfy the *Bolden* standard.

might conceivably elect a Negro councilman though the city as a whole would not. This probably is the prime reason behind the proposed change."

It is not easy for a court in 1981 to decide what motivated people in 1959. The series of events leading up to the current system of electing the city council of Pensacola, however, certainly suggests racial motivation. Furthermore, though not legislative history, editorials written contemporaneously with the action are probative evidence of the motivation of the action.

The district court found that "[t]he conclusion of plaintiffs' expert historian that race was a concurrent motivating factor in the 1959 change is inescapable (footnote omitted)." We agree.

## IV. *Conclusion*

Having found that the at-large systems for electing school board members and city council members were born out of a desire to keep blacks from being elected, our inquiry is virtually complete.

■ The Supreme Court in *Bolden* found proof of purpose to be the major stumbling block, apparently agreeing that if the Mobile system had been established intentionally to keep blacks from being elected, then a constitutional case [17] would have been made. In other words, while there is nothing *per se* unconstitutional about the at-large system of electing local governmental bodies, *e. g., White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct.

1858, 29 L.Ed.2d 363 (1971), if the purpose of adopting or operating that particular system is invidiously to minimize or cancel out the voting potential of racial minorities, and it has that effect, then it is unconstitutional.

In this case we agree with the district court that the at-large systems for city council and school board were purposely adopted to minimize the voting strength of the black community. Because it is undeniable that the systems have in fact had that effect,[18] we conclude that they are unconstitutional.

The defendants argue that such a conclusion is not warranted because: (1) white candidates actively seek black support; (2) the district court found them to be responsive to the needs of the black community; and (3) as to the city, there is no evidence that the system is being maintained for invidious reasons.

The first two arguments grow out of the district court's analysis of the now-discredited *Zimmer* criteria. After *Bolden* it would seem that neither of those two factors, whether whites campaign for black support or whether the people in elective positions are responsive to minority needs, is relevant to the constitutional inquiry. Rather, the inquiry is more circumscribed— was the system purposefully designed or perpetuated to minimize the voting strength of a recognizable, distinct class which has been singled out for different treatment under the laws, *Castaneda v. Partita*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), and does it have

---

**17.** *See* note 9, *supra*, for a discussion of which constitutional provision has been violated.

**18.** The defendants argued at length in their briefs and at oral argument that there is no discriminatory effect in this case because whites campaign for black votes and were found to be generally responsive to the needs of the black community. The defendants' argument misses the point. That the governing body may be benevolent is not relevant. The effect necessary for a case to be made is dilution of the votes of the minority. This is generally proven by evidence that a substantial minority is consistently unable to elect candidates of its choice.

In this case it is very clear that the at-large systems are having the effect they were designed to have—blacks are consistently defeated in their bids for elective office. This is not to be interpreted to mean, of course, that every time a black is defeated in a head-to-head race against a white that the election is tainted. We hope eventually we will reach the point where local governing bodies can be elected on an at-large basis, and people will vote for candidates based on their individual merit and not on the color of their skin. Unfortunately, we have not yet reached that stage.

that effect? Whether current office holders are responsive to black needs and campaign for black support is simply irrelevant to that inquiry; a slave with a benevolent master is nonetheless a slave.

We can similarly dispose of the city council's argument that because there is a finding that its at-large system is not being perpetuated to minimize black voting strength, it is immune from constitutional attack. Essentially, it argues that the passage of time can transform an unconstitutional system into a constitutional one. We disagree. If the system was unconstitutional in its inception and if it continues to have the effect it was designed to have, then the pure hearts of current council members are immaterial.[19]

The judgment of the district court is AFFIRMED in part and REVERSED in part.

Charles S. Rhyne, Washington, D. C., for defendants-appellants.

Blacksher, Menefee & Stein, P.A., J. U. Blacksher, Mobile, Ala., Kent Spriggs, Tallahassee, Fla., Jack Greenberg, New York City, Edward Still, Birmingham, Ala., for plaintiffs-appellees.

Before COLEMAN, PECK * and KRAVITCH, Circuit Judges.

---

19. That is not to say pure hearts on the part of council members are not desirable or laudable but only that this is not relevant to the issue here presented. Our purpose is to correct a system which was set up to, and does, minimize the voting strength of a sizeable minority of the population. We are not here to punish

or praise the current policies or motivations of these council members—good people can be elected by a bad system. It is the system that is unconstitutional and that must be corrected.

