United States Court of Appeals,

Eleventh Circuit.

No. 94-3448.

Brenda M. JOHNSON; William Guice; Oliver Flemming; Jessie Alford, Plaintiffs-Appellees,

v.

DESOTO COUNTY BOARD OF COMMISSIONERS, R.V. Griffing, in his official capacity as Chairperson of the DeSoto County Board of Commissioners; John Ed. Johnson, in his official capacity as member of the DeSoto County Board of Commissioners; Paul Whitlock, in his official capacity as member of the DeSoto County Board of Commissioners; Ed W. Horton, in his official capacity as a member of the DeSoto County Board of Commissioners; Raymond Stewart, in his official capacity as a member of the DeSoto County Board of Commissioners, Defendants,

DeSoto County School Board, Defendant-Appellant,

Rodney Hollingsworth, in his official capacity as Chairperson of the DeSoto County School Board; Phyllis Nesmith, in her official capacity as a member of the DeSoto County School Board; James Westberry, in his official capacity as a member of the DeSoto County School Board; Ronnie Allen; Marion Carroll, in her official capacity as a member of the DeSoto County School Board; David Thornton, in his official capacity as Supervisor of Elections for DeSoto County, Defendants.

Jan. 23, 1996.

Appeal from the United States District Court for the Middle District of Florida. (No. 90-366-Civ-FtM-17D), Elizabeth A. Kovachevich, Judge.

Before BIRCH and CARNES, Circuit Judges, and SIMONS[*], Senior District Judge.

CARNES, Circuit Judge:

The DeSoto County, Florida School Board appeals the district court's grant of summary judgment against the School Board and in favor of the plaintiffs who are four black registered voters in

---

[*]Honorable Charles E. Simons, Jr., Senior U.S. District Judge for the District of South Carolina, sitting by designation.

DeSoto County.  The district court held that the election of the School Board members through an at-large voting system, established by a 1947 Florida Act, now codified as Florida Statutes §§ 230.08 and 230.10, violates § 2 of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973 (West 1994).

The district court's judgment is based upon its holding that the Florida Legislature's intent in enacting the 1947 Act was to discriminate against blacks.  That holding is in turn premised upon the court's conclusion that two decisions of this Court involving the same state statute but different counties preclude as a matter of law any contrary finding about the intent behind the legislation.  After setting out the facts and procedural history of this case in Part I of this opinion, we explain in Part II.A why the two prior decisions of this Court that the district court relied upon do not foreclose the intent inquiry in this case.  The district court also held that a showing of intent to discriminate establishes a violation of § 2 of the Voting Rights Act regardless of whether the plaintiffs prove any discriminatory results, and in Part II.B we explain why that holding is error.  We then discuss in Part II.C the role that a finding of intent to discriminate does play in a § 2 determination.  Part III contains our conclusion.

## I. FACTS AND PROCEDURAL HISTORY

In 1947, the Florida Legislature adopted an at-large system for the election of county school boards.  Fla.Stat. §§ 230.08 & 230.10.  Although the legislature amended the statute in other respects in 1955 and 1969, it retained the at-large election system.  Fla.Stat. §§ 230.08 & 230.10 (1993).  Pursuant to the

amended 1947 Act, the DeSoto County School Board consists of five members elected at-large from five residential districts.

The plaintiffs filed suit against the School Board claiming that DeSoto County's at-large method of electing school board members violated § 2 of the Voting Rights Act by diluting minority voting strength.[1]  The district court granted the plaintiffs' motion for summary judgment and enjoined DeSoto County from conducting at-large school board elections. *Johnson v. DeSoto County Bd. Comm'rs,* 868 F.Supp. 1376 (M.D.Fla.1994).  The district court based its judgment upon a holding that "binding precedent" precluded the School Board from litigating the issue of intent, and a holding that intent alone is sufficient to establish a claim under § 2 of the Voting Rights Act.  *Id.* at 1379.  In the alternative, the district court held that even if some proof of discriminatory results is necessary to establish a § 2 violation, where intent to discriminate exists such results "need only be minimal," and the court concluded that the undisputed evidence established what it described as the requisite "minimal current

---

[1]In addition, the plaintiffs claimed that the county's at-large system for electing school board members violated the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution.  However, neither side sought summary judgment on those constitutional claims, and this appeal does not concern them.

The plaintiffs also alleged violations under § 2 of the Voting Rights Act, as well as constitutional violations, stemming from the at-large system for electing the DeSoto County Board of Commissioners.  The district court denied the plaintiffs' motion for summary judgment insofar as the Board of County Commissioners election is concerned, but this appeal does not concern these claims.  The district court has stayed the trial involving the Board of County Commissioners while this appeal is pending.

results."  *Id.* at 1380.

The School Board appeals the district court's judgment, contending that the district court erred in holding:  (1) that two prior Eleventh Circuit precedents precluded the School Board from litigating whether there was discriminatory intent behind the 1947 Act;  (2) that a violation of § 2 of the Voting Rights Act can be established by evidence of discriminatory intent alone, without a showing of discriminatory results;  and (3) in the alternative, that once intent to discriminate is established, "current minimal" discriminatory results is all that plaintiffs need show in order to prevail.

## II. DISCUSSION

We review a district court's grant of summary judgment *de novo,* considering the evidence in the light most favorable to the nonmovant.  *E.g., Flores v. Carnival Cruise Lines,* 47 F.3d 1120, 1122 (11th Cir.1995).  We independently review the record that was before the district court, utilizing the same standards applied in the district court.  *E.g., Real Estate Fin. v. Resolution Trust Corp.,* 950 F.2d 1540, 1543 (11th Cir.1992).

A. THIS COURT'S PRIOR HOLDINGS IN THE *ESCAMBIA COUNTY* AND *GADSDEN COUNTY* CASES REGARDING THE INTENT BEHIND THE 1947 ACT DO NOT FORECLOSE THE ISSUE IN THIS CASE

The district court held that this Court's decisions in *McMillan v. Escambia County, Florida,* 638 F.2d 1239 (5th Cir.1981), *vacated in part on other grounds,* 466 U.S. 48, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984), and *NAACP v. Gadsden County School Board,* 691 F.2d 978 (11th Cir.1982), are binding precedent on the issue of the intent behind the 1947 Act, which foreclose further consideration

of that issue in this case.  The district court stated:

> [T]he *McMillan* [*v. Escambia County* ] Court found the [at-large election] statutes unconstitutional.  The *Gadsden [County]* Court followed the precedent.  An appellate court's finding that a statute [enacted with discriminatory intent] is unconstitutional is an interpretation of constitutional law, which is binding precedent and is therefore relevant and applicable in the instant case.

*DeSoto County,* 868 F.Supp. at 1379.  That reasoning is based upon a misreading of our holdings in *Escambia County* and *Gadsden County.*[2]

In both *Escambia County* and *Gadsden County,* the plaintiffs brought suit against their local school board, arguing that the system of electing the school board violated the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution.[3]  As part of their Fourteenth Amendment claim, the

---

[2]The plaintiffs characterize the district court's holding that *Escambia County* and *Gadsden County* are "binding precedent" as an application of the *stare decisis* doctrine.  However, the district court's decision was not based upon *stare decisis* but instead upon the basic principle that district courts must follow the holdings of their court of appeals and the Supreme Court. These two principles, binding precedent and *stare decisis,* are distinct.  The doctrine of *stare decisis* accords a court discretion to depart from one of its own prior holdings if a compelling reason to do so exists. *E.g., Hilton v. South Carolina Pub. Ry. Comm'n,* 502 U.S. 197, 202, 112 S.Ct. 560, 563–64, 116 L.Ed.2d 560 (1991).  The binding precedent rule affords a court no such discretion where a higher court has already decided the issue before it.

[3]Although *Escambia County* and *Gadsden County* dealt primarily with Fourteenth Amendment claims, and the present case concerns a claim under § 2 of the Voting Rights Act, all of the cases present the identical issue concerning whether there was discriminatory intent behind the 1947 Act.  The primary difference between Fourteenth Amendment claims and § 2 claims, which does not affect our present inquiry, is that under the Fourteenth Amendment, plaintiffs are required to show discriminatory intent as well as discriminatory results.  In contrast, plaintiffs in § 2 cases, such as this one, who prove discriminatory results do not have to show discriminatory intent. *See, e.g., Thornburg v. Gingles,* 478 U.S. 30, 35, 106 S.Ct. 2752,

plaintiffs in both of those cases were required to prove: (1) the existence of discriminatory intent behind the 1947 Act, which authorized the challenged election system, and (2) that the operation of the challenged election system has led to discriminatory results in that county. *Gadsden County,* 691 F.2d at 981; *Escambia County,* 638 F.2d at 1243. Proving that the 1947 Act was enacted with discriminatory intent was one part of the plaintiffs' cases in those cases, but the plaintiffs did not have to show, nor did they show, that the legislation itself was unconstitutional in all of its applications, i.e. as it applied in every county of the state.

Furthermore, both *Escambia County* and *Gadsden County* treated the district court's findings regarding the intent behind the 1947 Act as factual determinations, not legal conclusions. *Gadsden County,* 691 F.2d at 981-82 (applying the clearly erroneous standard of review, which is applicable to findings of fact and not to conclusions of law); *Escambia County,* 638 F.2d at 1243 (suggesting "several possible evidentiary sources for such a [factual] determination"); *see also Rogers v. Lodge,* 458 U.S. 613, 622-23, 102 S.Ct. 3272, 3278, 73 L.Ed.2d 1012 (1982) (describing district court determinations regarding the invidious purpose behind an at-large election system as "factual findings" subject only to "clearly erroneous" review). In both *Escambia County* and *Gadsden County,* the panels held based upon the evidence presented in those cases that there was discriminatory intent behind the 1947 Act.

2758, 92 L.Ed.2d 25 (1986). In Part II.B, *infra,* we address the converse of that proposition—whether plaintiffs who show discriminatory intent also must prove discriminatory results.

The *Escambia County* panel upheld—held not to be clearly erroneous—a district court's finding, based upon the evidence presented in that case, that there was discriminatory intent behind the 1947 Act. 638 F.2d at 1245-46. The *Gadsden County* panel, one year after *Escambia County* had been decided, again applied the "clearly erroneous" standard; it reversed as clearly erroneous in light of the evidence presented in that case, a district court's factfinding that there was no discriminatory intent behind the 1947 Act. 691 F.2d at 982.[4]

The *Gadsden County* Court's treatment of the intent issue is itself inconsistent with the district court's conclusion in this case that the *Gadsden County* and *Escambia County* decisions establish as a matter of law that there was discriminatory intent behind the 1947 Act. If a prior panel's holding regarding the intent behind the 1947 Act established as a matter of law what that intent was, then the *Gadsden County* Court would have treated the

---

[4]The *Gadsden County* opinion does discuss the *Escambia County* panel's conclusion that "it was clear beyond peradventure" that the at-large system had been adopted with an invidious motivation. *Gadsden County,* 691 F.2d at 982. However, that reference comes only after the opinion discusses the evidence presented in the *Gadsden County* case itself, and only after it squarely held that: "The trial court's finding on the question must be upheld unless it is clearly erroneous." *Id.* at 981-82. The *Gadsden County* opinion's conclusion that the trial court's finding in that case was clearly erroneous was based upon the "[d]irect evidence of discriminatory intent in the enactment of the election scheme ... presented by plaintiff's expert witness ..." and the compelling evidence of the historical chronology involving the enactment of the 1947 Act. *Id.*

District court factfindings in a case must be based upon evidence presented in that case. An appellate court's conclusion about whether a different district court's factfinding in another case was clearly erroneous based upon the evidence in that other case cannot itself be evidence in a later case.

*Escambia County* holding regarding the 1947 Act's intent as binding precedent. It did not. Instead, *Gadsden County* examined the intent issue as a question of fact, to be decided based upon the evidence in the case before it, which left the door open for a decision on the intent issue different from that reached in the earlier *Escambia County* case.

If the district court were correct that the issue of the intent behind the 1947 Act were a question of law, the *Gadsden County* Court would have been compelled by our prior panel precedent doctrine to follow the *Escambia County* Court's conclusion that the 1947 Act was enacted with discriminatory intent, instead of examining the issue anew, as it did. *See, e.g., Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (a prior panel decision cannot be overruled by another panel but must instead be followed by it); *United States v. Woodard,* 938 F.2d 1255, 1258 n. 4 (11th Cir.1991), *cert. denied,* 502 U.S. 1109, 112 S.Ct. 1210, 117 L.Ed.2d 449 (1992). That the *Gadsden County* Court examined the intent issue as one of fact to be decided anew in that case is itself a holding, albeit an implicit one, that is binding upon this panel. In order to be consistent with *Gadsden County* 's treatment of the intent issue as one of fact even after the *Escambia County* decision, we hold that neither of those two decisions established as a matter of law that the 1947 Act was motivated by an intent to discriminate.[5] On remand, it will be

---

[5]We realize that if the evidence in this case were identical to the evidence presented in *Gadsden County,* the decision in that case, that failure to find discriminatory intent from such evidence is clearly erroneous, would be binding precedent which would compel a finding of discriminatory intent from the same

necessary for the district court to determine as a factual matter, based upon the relevant evidence and testimony presented by the parties in this case, whether there was discriminatory intent behind the 1947 Act.[6]

## B. DISCRIMINATORY INTENT ALONE IS INSUFFICIENT TO ESTABLISH A VIOLATION OF SECTION 2

After erroneously holding that this Court's precedents established as a matter of law that there was discriminatory intent behind the 1947 Act, the district court held that "proof of discriminatory intent is sufficient to establish a § 2 violation." *DeSoto County,* 868 F.Supp. at 1379. That holding is inconsistent with the Supreme Court's decision in *Voinovich v. Quilter,* 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993).

*Voinovich* involved a § 2 challenge to an apportionment plan that created a number of state legislative districts dominated by

---

evidence in this case. However, the School Board in this case contends, without contradiction from the plaintiffs, that it has proffered evidence not presented in either *Escambia County* or *Gadsden County.* The School Board describes that additional evidence as expert opinion that discriminatory intent did not motivate the 1947 Act. The credibility of competing experts and the weight to be accorded the evidence submitted by both sides will, of course, be decided by the district court, subject only to clearly erroneous review on appeal.

[6]We recognize that there is an unresolved collateral estoppel issue in this case. The district court did not reach the plaintiffs' contention that the School Board in this case is collaterally estopped by the *Gadsden County* and *Escambia County* judgments from denying that the 1947 Act was motivated by the intent to discriminate. We decline to decide that issue in the first instance both because it may be unnecessary to the ultimate disposition of this case, and also because the record may not be adequately developed at this point. Nothing said in this opinion is meant to imply any view on the collateral estoppel issue, which the district court may address on remand, and which it must address if unconvinced by the evidence presented in this case that discriminatory intent motivated the 1947 Act.

minority voters ("majority-minority districts"). The Supreme Court reversed the district court's holding that § 2 itself prohibits the creation of majority-minority districts unless such districts are necessary to remedy a violation of that provision. 507 U.S. at --- -, 113 S.Ct. at 1156. The unanimous opinion in *Voinovich* stated: "We hold only that, under § 2 of the Voting Rights Act of 1965 ... plaintiffs can prevail on a dilution claim *only if* they show that, under the totality of the circumstances, the State's apportionment scheme has the *effect* of diminishing or abridging the voting strength of the protected class." *Id.* at ----, 113 S.Ct. at 1157 (emphasis added). In explaining why § 2 does not *per se* prohibit creation of majority-minority districts, the Court stated that, "§ 2 focuses exclusively on the consequences of apportionment. Only if the apportionment scheme has the *effect* of denying a protected class the equal opportunity to elect its candidate of choice does it violate § 2." *Id.* at ----, 113 S.Ct. at 1156. That statement is followed by a quotation from *Thornburg v. Gingles,* 478 U.S. 30, 46, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986), that "electoral devices ... may not be considered *per se* violative of § 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process." *Voinovich,* 507 U.S. at ----, 113 S.Ct. at 1156. For that reason, the Supreme Court held that the district court "was required to determine the consequences of Ohio's apportionment plan before ruling on its validity; the failure to do so was error." *Id.* That clear holding in *Voinovich* forecloses the district court's holding, and the plaintiffs' position, that

discriminatory intent alone can violate § 2 even without discriminatory results.

The plaintiffs seek to escape the force and effect of *Voinovich* by arguing that: (1) the parts of the *Voinovich* opinion inconsistent with the plaintiffs' position are dicta, and (2) that those parts of *Voinovich* were overruled by the Court's decision in *Johnson v. De Grandy,* --- U.S. ----, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994), anyway. We are not convinced of either proposition.

With regard to the suggestion that the relevant parts of *Voinovich* are dicta, it is true that the Supreme Court also held in that case that the district court's finding of intentional discrimination was clearly erroneous, 507 U.S. at ----, 113 S.Ct. at 1159, and thus the Court was not actually presented with a case in which discriminatory intent existed. However, the discussion in the *Voinovich* opinion about discriminatory results being essential to a § 2 violation comes before the part about whether intent to discriminate had been proven in that particular case. At the least, the results discussion is an alternative holding of the case, and we are bound by alternative holdings. *See, e.g., Commonwealth of Mass. v. United States,* 333 U.S. 611, 623, 68 S.Ct. 747, 754, 92 L.Ed. 968 (1948); *McLellan v. Miss. Power & Light Co.,* 545 F.2d 919, 925 n. 21 (5th Cir.1977). Moreover, the Supreme Court itself denominated its pronouncement about discriminatory results being essential to a vote dilution claim a holding, 507 U.S. at ----, 113 S.Ct. at 1157 ("We hold ..."), and we will not

second guess the Court on that.[7]

We also disagree with the plaintiffs' contention that the Supreme Court's subsequent decision in *De Grandy* overruled its decision in *Voinovich.*  The *De Grandy* case involved a § 2 challenge to a state reapportionment plan that called for single-member districting.  The State argued that its districting plan should be immune from challenge under § 2 because minority voters formed effective voting majorities in a number of districts roughly proportional to their shares in the voting-age population.  The plaintiffs in that case disagreed, pointing out that a districting plan might be "proportional" but still violate § 2 by trading off the rights of some members of a minority group against the rights of other members of the same minority group.  The Court agreed with the plaintiffs, explaining that, "Under the State's view, the most blatant racial gerrymandering in half of a county's single member districts would be irrelevant under § 2 if offset by political gerrymandering in the other half, so long as proportionality was the bottom line."  *De Grandy,* --- U.S. at ----, 114 S.Ct. at 2661. That reasoning and that holding are not, however, inconsistent with *Voinovich.*

---

[7]We do not mean to imply that if the discriminatory results discussion in the *Voinovich* opinion had been dicta, we would be free to ignore it.  *See, e.g., United States v. Santana,* 6 F.3d 1, 9 (1st Cir.1993) ("[c]arefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative when, as in this instance, badges of reliability abound");  *Nichol v. Pullman Standard, Inc.,* 889 F.2d 115, 120 n. 8 (7th Cir.1989) (court of appeals "should respect considered Supreme Court dicta");  *United States v. Beale,* 731 F.2d 590, 593 (9th Cir.1983) (because the Supreme Court dicta "is so recent and appears to be so carefully considered ... we feel obliged to apply it to the case at hand").

The *De Grandy* Court did not say that some § 2 plaintiffs may prevail without showing discriminatory results, nor is there anything in that decision which contradicts *Voinovich* 's holding that discriminatory results must be shown in order to establish a § 2 violation. *De Grandy* simply establishes that the requisite discriminatory results may be shown with regard to one group of minority voters, even though there are no discriminatory results with regard to other members of the same minority group, or with regard to minority voters considered as a whole. Moreover, it is incredible to suggest, as the plaintiffs do, that the Supreme Court in *De Grandy* intended to overrule *sub silentio Voinovich,* a unanimous decision it had reached only one year earlier, and that it did so without a single member of the Court protesting such an abrupt departure from *stare decisis.* For all of these reasons, we reject the plaintiffs' contention that *De Grandy* eviscerated *Voinovich.* To the contrary, *Voinovich* is still the law, and it binds us.

Even if *Voinovich* did not bind us, we would still be bound by the plain language of § 2, which states:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which *results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....

42 U.S.C.A. § 1973(a) (West 1994) (emphasis added). That statutory language expressly requires a showing of discriminatory results, and it admits of no exception for situations in which there is discriminatory intent but no discriminatory results.

Despite *Voinovich* and the plain language of § 2, the

plaintiffs still contend that intent alone is enough, and point to statements from the Senate Report that accompanied the 1982 amendments to § 2. The 1982 Amendments arose in response to *City of Mobile, Alabama v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), in which the Supreme Court held that § 2 required proof of discriminatory intent in addition to proof of discriminatory results. Congress amended § 2 "to restore the legal standard that governed voting discrimination cases prior to the Supreme Court's decision in *Bolden* "—a standard Congress perceived as allowing plaintiffs to prevail without proving discriminatory intent. S.Rep. No. 417, 97th Cong., 2d Sess. 15 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 192; *see also Gingles,* 478 U.S. at 35, 106 S.Ct. at 2758.

The plaintiffs point to several statements in the Senate Report that suggest that intent alone is sufficient to establish a § 2 violation, and urge this Court to interpret § 2 accordingly. For example, the Senate Report states: "[p]laintiffs must either prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process." S.Rep. No. 417 at 27, *reprinted in* 1982 U.S.C.C.A.N. at 205 (footnote omitted). Similarly the Senate Report states: "During the hearings on the Voting Rights Act of 1965, Attorney General Katzenbach testified that section 2 would ban "any kind of practice ... if its *purpose or effect* was to deny or abridge the right to vote on account of race or color.' " *Id.* at 17, *reprinted in* 1982 U.S.C.C.A.N. at 194 (quoting *Hearings*

*on S. 1564 Before the Committee on the Judiciary, United States Senate,* 89th Cong., 1st Sess. 191 (1965)).

We recognize that the Supreme Court has referred to the Senate Report as the "authoritative source for legislative intent" about the amended § 2. *Gingles,* 478 U.S. at 43 n. 7, 106 S.Ct. at 2762 n. 7. Even so, that report does not require, or even allow, us to hold that intent alone is sufficient under § 2. For one thing, the Senate Report is ambiguous. In addition to the statements that the plaintiffs point to, the Senate Report also states that the intent test "asks the wrong question," and that the proper question is "whether minorities have equal access to the process of electing their representatives." S.Rep. No. 417 at 36, *reprinted in* 1982 U.S.C.C.A.N. at 214.

Moreover, the Supreme Court has never held that the Senate Report can override the plain language of § 2 itself. To the contrary, the Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992); *see also United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989); *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985). It is precisely this principle of statutory construction that we believe the Supreme Court was following in *Voinovich.*

That brings us to the third, and perhaps most conclusive, reason that we cannot read the results requirement out of § 2 based

upon anything in the Senate Report. The Supreme Court was well aware of the Senate Report when *Voinovich* was decided, and notwithstanding any statements to the contrary in that report, the Court held that in order to prevail on a § 2 claim, a plaintiff must prove discriminatory results. We are bound by Supreme Court holdings, not by statements in legislative committee reports.[8]

## C. A FINDING OF INTENT TO DISCRIMINATE SERVES AS CIRCUMSTANTIAL EVIDENCE OF DISCRIMINATORY RESULTS

Given our holding that intent alone is insufficient to establish a § 2 violation, we still must address what role, if any, discriminatory intent plays in a § 2 claim. The district court held, in the alternative, that even if discriminatory intent alone is not enough to establish a violation, the existence of such intent lessens the necessary showing of discriminatory results. The district court stated: "[E]ven if proof of current effects was necessary, this Court agrees with Plaintiffs' position that it need only be minimal...." *DeSoto County,* 868 F.Supp. at 1380. The School Board disagrees, and argues that proof of discriminatory

---

[8]The plaintiffs also point to a statement in *Nipper v. Smith,* 39 F.3d 1494 (11th Cir.1994) (en banc), *cert. denied,* --- U.S. ----, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995), in which two of the eight judges of this Court sitting en banc stated:

> Thus, under section 2 as amended, a plaintiff once again may demonstrate a violation by proving either: (1) the subjective discriminatory motive of legislators or other relevant officials; or (2) the existence of objective factors demonstrating that the electoral scheme interacts with racial bias in the community and allows that bias to dilute the voting strength of the minority group.

*Id.* 39 F.3d at 1520. However, that statement is dictum, it was only joined by two of the eight members of this Court participating in *Nipper,* and it is inconsistent with the express contrary holding by the Supreme Court in *Voinovich.*

intent is irrelevant in a § 2 case. We believe that both the district court's alternative holding and the School Board's position miss the mark.

We have already explained how the district court's primary holding, that intent to discriminate eliminates the necessity for any proof of discriminatory results, is inconsistent with the Supreme Court's *Voinovich* decision. Likewise, the district court's alternative holding that intent to discriminate lessens the amount of discriminatory results that must be shown suffers from the same problem—it, too, is inconsistent with one of the Supreme Court's *Voinovich* holdings. In that case, the district court had placed the burden of justifying the challenged practice on the State. 507 U.S. at ----, 113 S.Ct. at 1156. The Supreme Court explained that the district court's shifting of the burden was a departure from the requirements of the statute, which places the burden on § 2 plaintiffs to prove the challenged practice produces discriminatory results, and "[b]ecause that departure from the statutorily required allocation of burdens finds no support in the statute, it was error for the District Court to impose it." *Id.* The same is true here. The statute itself requires that discriminatory results be shown; it does not provide that minimal results or "minimal current effects" will suffice. Because the district court's departure from the statutorily required showing in this case "finds no support in the statute," it was error for the court to impose it. *Id.*

We are left with the question of what effect a finding of intent to discriminate has in the § 2 calculus. The School Board

argues it has no effect, but we reject that position. Indeed, if we were writing on a clean statutory and decisional law slate, we would hold that a finding of discriminatory intent has a strong presumptive effect. The fact that a statute is enacted with discriminatory intent establishes, at the least, that the legislature hoped and believed the statute would lead to discriminatory results. It would be reasonable for a court to presume, absent proof to the contrary, that the legislature believed correctly, and that the statute indeed resulted in discrimination. *Cf. International Bhd. of Teamsters v. United States,* 431 U.S. 324, 359 n. 45, 97 S.Ct. 1843, 1867 n. 45, 52 L.Ed.2d 396 (1977) ("[p]resumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities"). The fact that the body intending to harm blacks was a legislature, composed of elected officials thoroughly knowledgeable about political, electoral, and racial realities across the state, certainly suggests that any doubt about discriminatory results should be resolved in favor of concluding that those officials knew how to achieve their nefarious ends. *Cf. Board of Educ. of Oklahoma City, Pub. Sch., Independent Sch. Dist. No. 89, Oklahoma City, Okla. v. Dowell,* 498 U.S. 237, 267 n. 10, 111 S.Ct. 630, 647 n. 10, 112 L.Ed.2d 715 (1991) (Marshall, J., dissenting) (pointing out that in situations in which a school district has engaged in intentional segregation, every presumption established by the Court has been against the school board).

Were it up to us, we could justify a rule that discriminatory results should be presumed from discriminatory intent—that when

plaintiffs in a § 2 action prove that a voting standard, practice, or procedure was invidiously motivated, the burden of going forward and the burden of persuasion shift to the defendant. In such a case, the defendant would have the burden of proving that under the "totality of the circumstances" the challenged standard, practice, or procedure did not "result[ ] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color...." 42 U.S.C.A. § 1973(a) (West 1994). But it is not up to us. Our hands are tied by the Supreme Court's decision in *Voinovich* which squarely held that "[t]he burden of "show[ing]' the prohibited effect, of course, is on the plaintiff; surely Congress could not have intended the State to prove the invalidity of its own apportionment scheme." 507 U.S. at ----, 113 S.Ct. at 1156. *Voinovich* reversed the action of a lower court in shifting the burden of proof in a § 2 case, because it was a "departure from the statutorily required allocation of burdens [that] finds no support in the statute." *Id.* The same is true of our preferred course, and so the slate is far from clean.

Still, proof of intent to discriminate is not irrelevant in a § 2 action. It is circumstantial evidence of discriminatory results that should be considered in assessing the "totality of the circumstances." Where it can be inferred, as it often can be, that the enactors were in a good position to know the effect their actions would have, the fact that the enactment was motivated by a desire to produce discriminatory results will often be strong, albeit circumstantial, evidence that such results were achieved. Nothing in *Voinovich* or any other Supreme Court decision, and

nothing in the language of § 2 itself, prohibits drawing an evidentiary inference about results from intent. Of course, the evidentiary weight that intent to discriminate should be given will vary, depending upon the circumstances. For example, where statewide legislation is involved, the legislators may have intended to affect as many county school board elections as possible, but the maximum effect that legislation can have in a particular county will depend upon the racial composition of the county's electorate and other factors.

If, after conducting an evidentiary hearing, the district court in this case finds that the 1947 Act was enacted with the intent to discriminate, it can consider the existence of that intent as circumstantial evidence of discriminatory results. The existence of discriminatory intent can be considered with all of the other evidence to determine whether the plaintiffs have carried their burden of proving that the at-large system for electing DeSoto County School Board members has resulted in the denial or abridgement of the plaintiffs' right to vote on account of their race or color.

### III. CONCLUSION

The district court's grant of summary judgment against the School Board is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.