Brenda **JOHNSON, et al., Plaintiffs,**

v.

**DESOTO COUNTY SCHOOL BOARD, et al., Defendants.**

No. 90–366–CIV–FTM–17D.

United States District Court, M.D. Florida, Fort Myers Division.

Feb. 26, 1998.

Neil Bradley, Cristina M. Correia, Laughlin McDonald, Maha Zaki, ACLU Foundation, Inc., Atlanta, GA, Robert B. McDuff, Law Office of Robert B. McDuff, Jackson, MS, for Plaintiffs.

Robert M. Fournier, Taylor, Lawless & Singer, P.A., Sarasota, FL, for Defendants.

## *ORDER*

KOVACHEVICH, Chief Judge.

This cause comes before the Court on Remand from the Eleventh Circuit Court of

Appeals. This Court entered summary judgment in favor of the Plaintiffs and the Court of Appeals reversed and remanded the decision. This Court referred the matter to the assigned magistrate judge who held an evidentiary hearing on October 16, 1996, and who has submitted a Report and Recommendation ("R & R") addressing whether the 1947 at-large system for election of county school boards, Fla. Stat. §§ 230.08 and 230.10, were enacted with the intent to discriminate (Docket No. 175). The Defendants have submitted their Objections to the magistrate's R & R (Docket No. 176) and the Plaintiffs have submitted their Response to said Objections (Docket No. 179).

The Court of Appeals found that: (1) the two Eleventh Circuit decisions involving the same state statute, but different counties, do not preclude, as a matter of law, any contrary finding about the intent behind the legislation; and (2) a showing of intent to discriminate does not establish a *per se* violation of § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. Consequently, the Court must determine whether the Plaintiffs have carried their burden of proving that the at-large system for electing DeSoto County School Board members has resulted in the denial or abridgement of the Plaintiffs' right to vote on account of their race or color.

## DISCUSSION

The Eleventh Circuit's prior holdings in *McMillan v. Escambia County, Florida*, 638 F.2d 1239 (5th Cir.1981) and *NAACP v. Gadsden County School Board*, 691 F.2d 978 (11th Cir.1982) did not determine that the 1947 Florida Act, now codified as Florida Statutes §§ 230.08 and 230.10, was unconstitutional in all of its applications. *Johnson v. DeSoto County Board of Commissioners, et al.*, 72 F.3d 1556, 1560 (11th Cir.1996). In its opinion, the Eleventh Circuit explained that, although *Escambia County, Gadsden County*, and the case at hand, present the identical issue concerning whether there was discriminatory intent behind the 1947 Act, the findings with regard to intent are considered factual determinations, not legal conclusions. *Johnson* at 1560. Consequently, this Court must make its own factual findings with regard to the issue of discriminatory intent.[1]

In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, (1977), the Supreme Court set forth several possible evidentiary sources in order to determine whether invidious discriminatory purpose was a motivating factor.

> The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes.... Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decision maker strongly favor a decision contrary to the one reached. The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Id.* 429 U.S. at 267–268 (citations omitted).

The magistrate's recitation of the evidence presented by the parties' experts at the evi-

---

1. It is difficult to imagine that a Court will ever issue a finding of no discriminatory intent with regards to the 1947 Act. Typically the parties' experts give a historical account of the events leading up to the enactment of the 1947 Act. *See Gadsden County* at 982, where the Eleventh Circuit found that it was *clearly erroneous* for the district court "[to find] that the 1947 change was made without regard to the effect that it would have in diluting the black vote." *Id.* In *Gadsden*, the Circuit Court merely recounted the political highlights from 1901 through 1945, and cited to the expert witness who testified that the change in 1947 had been made to dilute the growing strength of the black vote. That expert opinion and direct evidence of discriminatory intent will always be available. Nevertheless, the Court must "determine as a factual matter, based upon the relevant evidence and testimony presented by the parties in this case, whether there was discriminatory intent behind the 1947 Act." *Johnson* at 1561.

dentiary hearing clearly demonstrates that discriminatory intent motivated the enactment of the 1947 Act. There is substantial evidence in the record that evidences discriminatory intent with respect to the enactment of the 1947 Act. The Plaintiff's expert, Dr. Mormino, described the techniques used to disfranchise the African–American votes by providing the Court with a detailed historical chronology leading up to the 1947 Act.

Florida's constitutions through 1865 limited the elective franchise to "free white males." Dr. Mormino testified that Florida's 1865 Constitution was designed to exert control over the freed men or ex-slaves. The 1865 Florida Legislature adopted what is referred to as the "Black Codes" which made disobedience, imprudence, even disrespect to the employer a crime. Florida's "Black Codes" were called the most bigoted of those adopted by southern legislatures. Theodore B. Wilson, *The Black Codes of the South,* Tuscaloosa: University of Alabama Press, 1065.

In 1868, the Republicans in the U.S. Congress who were angered by the southern "Black Codes" declared that all constitutions were invalid and mandated that the southern states devise constitutions. Dr. Mormino explained that radical Republicans in the U.S. Congress, angered by the "Black Codes" and southern recalcitrance, imposed what has been called a radical reconstruction, declaring that no legal governments existed in the south. Republicans won a majority of the seats in the Florida Convention of 1868, and eighteen of the forty-six delegates were African–American. The 1868 Constitution extended voting rights to all adult males which extended the right to vote to black males for the first time in the state's history. Although the predominant membership of the Republican party in 1868 was African–American, the power was really held by the white Republicans and Conservative Democrats, according to Plaintiffs' expert. Dr. Mormino testified that one of the most significant features of the 1868 Constitution was the centralization of power in the Governor by way of providing the governor's office with appointment power. Dr. Mormino testified that the use of these appointment powers was one method used to limit the effect of newly franchised black voters, especially in counties where blacks were in a majority.

Dr. Mormino testified that, William Cash, Florida State College for Women Professor and Democratic legislator, wrote in a book called *The History of the Democratic Party:*

> Prior to the Formation [sic] of the Constitution of 1868, it was known that there would be Negro suffrage and that the colored vote in the counties of larger population would constitute a majority. Certain farsighted citizens realized that it would be dangerous for ignorant colored votes to dictate how county government should be run and thought it much better to have the governor appoint the officials of each county.

*See* Tr. p. 32—p. 33

Dr. Mormino explained that one of the reactions to the 1868 Constitution was that a period of violence ensued which was directed towards Republicans, African–Americans, and those who challenged the system of white Democratic control. Dr. Mormino testified that the white Democrats regained power in 1876, both at the regional level in the south and state level in Florida. There would not be another Republican in the Tallahassee executive office for almost 100 years.

Dr. Mormino testified that, in 1876, almost one-half of Florida's population was African–American. Throughout the 1880's blacks continued to participate in the electoral process at a relatively high level. As late as 1884, 87 percent of African–Americans voted, who were primarily Republicans. However, in 1885, Florida adopted a new constitution.

Dr. Mormino noted that Florida's 1885 Constitution could be considered a white supremacy document. The 1885 Constitution prohibited all marriages between a white person and a Negro and authorized a poll tax. In addition, the 1885 Constitution authorized separate but equal schools. The

1885 decentralized power because there was a fear of centralizing power in Tallahassee, according to Dr. Mormino. Nevertheless, white Democrats "adroitly used the governor's office for appointment power, especially in those black belt counties, ... where African–Americans might elect delegates ..." Tr. 36. Dr. Mormino testified that historians and political scientists agree that the decision to maintain gubernatorial appointment of county commissions was clearly motivated by a discriminatory purpose. *See* V.O. Key, Jr., *Southern Politics in State and Nation* (New York, Alfred Knopf, 1949).

According to Dr. Mormino, in 1889, the Florida Legislature abolished the municipal government in Jacksonville, Florida. Jacksonville city aldermen were elected by single-member districts and African–Americans were represented on the city council. Dr. Mormino testified that the legislature abolished the elective city government in Jacksonville in order to end Republican control of the Jacksonville city council. Dr. Mormino explained that the racial purpose of this change, which eliminated black representation in Jacksonville city government, is not a matter of dispute among historians.

The 1889 Florida Legislature authorized the creation of the first local school boards in Florida and three board members were appointed by the State Board of Public Instruction. This State Board was comprised of the Governor, the Secretary of State, the Attorney General, the Treasurer, and the Superintendent of Public Instruction. Dr. Mormino opined that, in light of the racial climate in which the 1889 legislature worked, the purpose of requiring statewide appointment of school boards was to preclude the possibility that black voters in black-majority counties might elect school board members of their choice.

Dr. Mormino testified that the same Florida Legislature that created appointed county school boards in 1889 also adopted a poll tax requirement. Voters were required to produce receipts for the payment of a dollar capitation tax for the preceding two (2) years. Dr. Mormino explained that the poll tax was used more as a means of disfranchising blacks than it was for raising revenue. In addition, the Florida Legislature adopted the Eight Box Law.[2] According to Dr. Mormino, the effect of the said enactments severely diminished the African–American voting power. According to Plaintiffs' expert, in 1884, it was estimated that 84% of the African–American population eligible to vote, voted. In 1892, only 11% of eligible African–American voters participated, and by 1896, only 5% voted. In 1892, the Democratic Party barred African–Americans.

Dr. Mormino testified that in 1893, after the disfranchising mechanisms were in place, the Florida Legislature changed the membership of county boards of public instruction from appointive to elective. Defendant's expert, Dr. Rogers, agreed that blacks had been eliminated as voters by 1893 and that it would seem unlikely that blacks would be elected. The 1893 Florida Legislature provided that each county school board was to consist of three members. Each county school board was to divide their respective districts into three (3) county school board districts so as to place the same number of qualified voters in each district. Members were elected one from each county school board district by the qualified electors of such district.

In 1895, the Florida Legislature changed the method of electing members of local boards of public instruction to at-large. However, Dr. Mormino explained that the 1895 legislature also enacted a new wave of disfranchising laws. For example, the Australian ballot was introduced which is considered by some to be a *de facto* literacy test, according to Dr. Mormino. The poll tax was still in use. There were separate polling places for federal and state elections and only one voter was permitted to enter the

---

**2.** The Eight Box Law required a voter to put the ballot in a separate box for each elected office and was enacted with the intention of discouraging illiterate voters from participating in the elections. At the time, one-half of the African–American population could not read or write.

polling place at a time. In addition, the laws prohibited anyone other than inspectors to speak to voters. The legislature also provided that the order in which the titles to the several offices to be filled were to be arranged upon the ballots, were left to the discretion of the officer charged with printing said ballots. The laws permitted any elector to challenge the right to vote of any person. Finally, a five minute limit was set for voters to occupy a voting booth.

Dr. Mormino testified that the regulation of time and communication along, with the discretion to arrange the ballot order, served to make illiterate voters dependent upon the election officials. Dr. Mormino testified that the election devices adopted in 1889 and 1895 were remarkably effective in disfranchising the black vote. The at-large method of elections continued until 1907.

Dr. Mormino described the progressive movement in Florida as being both supportive of good schools and penal reform and the disfranchisement of black voters. Defendant's expert, Dr. Rogers agreed that the idea of progressivism included the elimination of black votes. Dr. Mormino explained that the use of at-large elections was part of what was described as the progressive reform.

In 1897, legislation was enacted which continued the at-large method of election for county school board members. Dr. Mormino testified that the 1897 legislature began regulating county primary elections adopting the first statutorily authorized "white" primaries. The statute was amended in 1901 to regulate all primaries held by any state or local party. Dr. Mormino explained that the white primary statutes provided that the party defines the membership to what will often be defined as the private club, the Democratic Party. In 1892, the Democratic platform barred those whose admission would violate "the purity and integrity of the party," a characterization understood as referring to blacks, according to Dr. Mormino. Dr. Mormino testified that Democratic leaders saw the white primary as an insurance policy. It was

apparently needed because the leaders felt that there was no way to be sure that the state's disfranchising devices were immune to federal intervention. In Dr. Mormino's opinion, the fact that the method of selecting county commissioners was changed from appointive to elective once the white primary was in place, is illustrative of the confidence in the white primary system.

Initially, parties had the discretion to call primaries. However, in 1913, legislation was passed which required parties to hold primaries. Dr. Mormino testified, it was his opinion that, the white primary was drastically effective in disfranchising black voters. Furthermore, Dr. Mormino testified that a number of cities, including Tampa, Florida, and Arcadia, Florida, operated white municipal primaries. These primaries were non-partisan and run by the cities themselves.

According to Dr. Mormino, the Florida Legislature attempted, in 1907 and 1909, to bar blacks from voting, however, after passing in the senate, these bills failed in the house. Another example of the blatant attempts to exclude blacks from voting was the grandfather clause of 1915. Under this legislation, potential voters would be subject to literacy tests and property ownership qualifications. Moreover, the legislation required that based on lineal descent, a voter had to be related to someone who voted in January 1, 1867. This would have precluded blacks from voting because they were not permitted to vote in 1867. However, voters failed to ratify the measure in the 1916 election, which took place after the Supreme Court struck down Oklahoma's grandfather clause.

Dr. Mormino testified that the changes from appointive to elected school boards in 1893 and county commissioners in 1900 were done only after disfranchisement was in place. Elections were used only when whites alone had the effective votes. In 1907, while the white primary was in place, the Florida Legislature changed the method of holding primary elections for county school boards from at-large to single-member districts.

Dr. Mormino opined that this 1907 legislation created a dual system of elections. In

the primaries, where blacks could not vote, the elections were held from single-member districts. In the general elections, where a small percentage of blacks were still voting, the election was held at-large. Dr. Mormino testified that legislation was enacted in 1915, 1929, and 1939 which confirmed this dual system of elections. Both the 1929 and 1939 legislation requiring single-member district primary elections specifically repealed all local legislation which deviated from the single-member district primary system. The state policy adopted by the statewide legislation of 1907, 1915, 1929, and 1939 was for single-member district primary elections.

In Dr. Mormino's opinion, the adoption of the mandatory district primaries, as well as the change from appointive to elective and the adoption of the primary, was seen as a way of returning more democratic government to white voters. According to Dr. Mormino, white Democrats preferred a district election as long as the white primary guaranteed that the black voters would not be able to elect candidates of their choice. However, since blacks were voting in the general elections, the election had to be at-large to insure that the black votes could not influence the election.

At the time of the 1947 legislation, only one county had at-large primaries for school board. Defendants' expert conceded that there was no trend in 1947 of local legislation switching to at-large primaries for school board. It is argued that one year prior to the Supreme Court's decision in *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), Florida attempted to save its white primary system by repealing the statutory provision that authorized state executive committees to declare the terms and conditions of party membership.

In 1944, the Supreme Court invalidated Texas' white primary as an infringement of the Fifteenth Amendment. *See Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944). State officials and political figures expressed great concern over the loss of control over the Democratic Party. For ex-

ample, Millard Caldwell, who eventually became governor, expressed his views in an article captioned *Caldwell Hits White Primary Court Ruling,* in the *Tampa Morning Tribune,* April 4, 1994. Mr. Caldwell explained that the decision of the U.S. Supreme Court in the Texas primary cases presented a threat against the right of the Democratic Party in Florida to govern the qualifications of its own membership. Mr. Caldwell urged immediate and affirmative action explaining that this new menace to the independence of the state and party must be resisted with all well directed energy. On April 5, 1944, in the *Tampa Morning Tribune,* a former legislator explained that he was hopeful that Negroes could be prevented from voting in the party's primaries that year despite the Supreme Court opinion.

To further demonstrate the concern in Florida during the relevant time period that blacks would be able to vote, Dr. Mormino presented an article from the *St. Petersburg Times,* February 22, 1945, in which, the Attorney General, Tom Watson, told Democratic Party leaders that Negro voting in their primary elections was inevitable and advised them to find a way that would reduce the evils. In addition, various other articles involving key public figures were introduced at the hearing which evidenced the same types of discriminatory sentiments.

The racial climate in Florida during this time period is a key issue in understanding Dr. Mormino's theory. Dr. Mormino asserts that the change to at-large elections was brought about because the white primary was eliminated and the legislature was looking for something else to take its place. In 1945, the Florida Supreme Court invalidated Florida's system of white primaries. *See Davis v. State ex rel. Cromwell,* 156 Fla. 181, 23 So.2d 85 (1945). Even after *Davis v. Cromwell,* African–Americans continued to experience resistance at the polls, according to Dr. Mormino. Subsequently, there were a number of measures introduced which were intended to deter black voters from voting in primaries. However, Dr. Mormino opined that these measures were defeated, not be-

cause of any moderation in Florida's commitment to the racial status quo, but rather, because the state's leaders were taking a wait and see approach and because there was already a very depressed voter registration by African–Americans. Moreover, Dr. Mormino opined that some believed black voters could be controlled, even in the absence of the white primary.

According to Dr. Mormino, one response by Florida's Democratic party to the *Smith v. Allwright* decision was the recommendation for segregated polling places. DeSoto County created segregated polling places in 1946, and Plaintiffs contend that DeSoto County maintained segregated precincts until, at least, 1967. The first legislative session following *Davis v. Cromwell*, was in 1947, during which, there was legislation introduced in an attempt to save the white primary laws. The legislation that was proposed would have repealed all primary laws.[3] Dr. Mormino testified that the defeat of the "white primary bill" was a result of fear by white Floridians that corruption would ensue if the primaries went unregulated.

During this same time period, there was a crises in Florida education. In 1945, Governor Caldwell appointed a Blue Ribbon Education Study Committee to study Florida's education system. Despite requests, there were no African–Americans appointed to the Committee. The Committee recommended "that there be non-salaried school board members, that the school board members be elected at-large, and that non-partisan primaries in elections be implemented." The Committee described the member they sought as one "measurably above his fellow citizens in the amount of his income, his educational attainment, and the stability of his place in the social unit." Obviously, African–Americans were not contemplated as becoming

board members.[4] Defendants argument that the all white Blue Ribbon Committee merely desired higher caliber board members and that the description of ideal board members in no way suggests that the committee ignored the impact this would have on blacks, is unpersuasive. Dr. Mormino testified that, it was unquestionable that the authors of the Education Study Committee did not have black men or black women in mind when they described the type of person they sought as county school board members. According to Dr. Mormino, "it would have been inconceivable in 1947 for the architects of the Minimum Foundation Program to be thinking of a black man serving on a school board in 1947." However, the only recommendation made by the Education Study Committee, regarding the composition and election of county school board members, that was adopted by the Florida Legislature was the change to at-large primary elections, rather than, single-member district primaries.

Governor Caldwell insisted upon at-large primary elections for school board and threatened to veto the school bill if it failed to change the method of holding school board primaries from single-member district to at-large. Dr. Mormino testified that, one of the Governor's motives in supporting the 1947 Education Bill was the issue of control at this time, especially in terms of race relations. In Dr. Mormino's opinion, Governor Caldwell had supported more money for the education of African–Americans in order to control them. In 1948, Governor Caldwell delivered a speech to a banking association in which he explained the need to improve education for blacks in Florida by stating:

> If we fail to provide for them here to be educated, then they will go to Pennsylvania, Ohio, New York, Wisconsin, and if

3. Dr. Mormino reinforced his opinion by pointing out that, in 1943, the statutory provision authorizing state executive committees to declare the terms and conditions of party membership was repealed and that that was an attempt to save Florida's version of the white primary after the decision of *U.S. v. Classic*, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941).

4. Dr. Mormino compared the language used by the Education Study Committee to describe the type of school board member with the qualifications for jurors, which permitted the exclusion of virtually all blacks from jury lists.

they turn into something worthwhile, they will probably stay there. If they acquire the philosophy of the Association for the Advancement of the Colored Race and become trouble makers, they'll come back to you in your community with foreign influence and foreign philosophy. You have them here. It is the job of this State to educate them here, under the condition and within the tradition of this State ...

*Florida ... Its Growth and Progress, The Southern Banker,* May, 1948.

Defendants argue that Governor Caldwell merely saw the change to at-large elections as essential to the success of school finance reform. However, in light of the governor's view expressed in his speech, Defendants' contention is discredited. Moreover, Plaintiffs argue that Defendants' connection between school finance reform and a school board elected at-large is flawed because the county school district trustees were retained. Plaintiffs point out that the 1947 Act did not change powers of the trustees who were already elected at-large. Moreover, Plaintiffs assert that, the need, expressed by Defendants, to elect school board members at-large, i.e. to permit county-wide funding, fiscal planning, and management of building, applied to the trustees whose powers did not change in 1947 pursuant to the Act. Plaintiffs argue that any need to elect the trustees at-large in 1947, does not automatically equate to a similar need to nominate school board members at-large.

One of the main purposes of the Act was to centralize administration of the funding for schools within a single body in the county. In addition, the Act brought funding to poor counties. According to Dr. Mormino, the legitimate goal of the Act was to improve education in the south so that new businesses would consider the south and the native population would have more economic opportunities. It is said that the other goal of the Act was to avoid federal action regarding "unequal" black schools, according Dr. Mormino. Dr. Mormino pointed out that there were individual lawsuits in Florida beginning in the 1940's that began the push for equality, especially with regards to teachers salaries. Dr. Mormino testified that, although the 1947 Minimum Foundation Bill did improve funding to black schools, it did not equalize spending among black and white schools. Plaintiffs contend that litigation brought about these changes, whereas, Defendants contend, it was due to racial moderation. The Court agrees with Plaintiff that where litigation brings about changes, it is proof that litigation works, not proof of racial moderation. *See Kirksey v. Bd. of Supervisors of Hinds County,* 554 F.2d 139, 146 (5th Cir. 1977). Moreover, Defendants ignore Dr. Mormino's testimony that there was fear of federal intervention.

In addition, Dr. Mormino provided examples, apart from the school board legislation, of how the Florida Legislature attempted to limit black voter participation by switching the method of election from single-member district to at-large. Dr. Mormino reported that in 1945, the Florida Legislature changed, subject to referendum approval, the method of electing the Tampa, Florida, City Council from single-member districts to at-large. Dr. Mormino noted that although black areas, as well as Latino and Italian neighborhoods, voted against the change, the city-wide vote favored at-large elections. Dr. Mormino also reported that the same legislator that introduced the "white primary bill" in 1947, Senator John Matthews, was successful, in 1947, in amending the Jacksonville City Charter to change from single-member district elections to at-large elections.

Moreover, Dr. Mormino noted that the sudden change in 1947 came immediately after a municipal election where African-American registration outnumbered white registration in one of Jacksonville's single-member districts, and where a white candidate won only after the black vote was split among two black candidates. This abrupt change is similar to what took place in the 1947 enactment. There is no doubt that the Florida legislatures understood the potential

disfranchising effect of at-large elections.[5] Dr. Mormino testified that, as long as black voters were effectively eliminated, the Florida legislature preferred single member districts. However, as soon as blacks began to register in more than minimal numbers, the system of at-large election provided a guarantee of "white rule."

Dr. Mormino opined that the 1947 legislation, which changed the method of electing county school boards to at-large nominations and elections, was racially motivated. Dr. Mormino specifically confronted Defendants' expert's theory that the change was the result of racial moderation. Furthermore, Dr. Mormino noted, the lack of racial moderation is evidenced by the fact that even as late as 1959, not one of Florida's county school systems was integrated.

Also, the Court finds that Defendants' argument that there was no public outcry against the 1947 legislation; therefore, the change to at-large elections must not have been racially motivated, unpersuasive. Plaintiffs argue that there was no public outcry when there was legislation enacted in 1943 to save Florida's white primary system. Furthermore, Defendant's expert, Dr. William Rogers, admitted that, in the past, he described the 1947 legislature as "diehard segregationists;" however, he explained that perhaps that categorization was too harsh and too broad. Nevertheless, the expert's description tends to support Plaintiffs' position. In addition, Dr. Rogers agreed that if the Florida legislature had not changed to at-large primaries in 1947, there was a possibility that black voters in some counties would have controlled the outcome of some elections. Moreover, Defendants' expert, Dr. Stephan Thernstrom, admitted that in the south, during 1947, there were diehard, rabid segregationists who were committed to the racial status quo. However, Dr. Thernstrom claimed that the lack of public outcry supports the proposition that the legislation was not racially motivated.

Florida's legislative history provides insight into the techniques used to control the elections of various local offices. The method of election used, along with the racial climate during the relevant time period, demonstrates that numerous efforts were made to exclude blacks from having any power to elect officials of their choice or influence elections. Plaintiffs' burden is merely to show that race was a motivating or substantial factor in the challenged decision. Plaintiffs are not required to show that race was the dominant or primary factor. *See Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). It is certainly more likely than not that the intent to discriminate was a motivating factor behind the 1947 at-large system for election of county school boards. Moreover, proof of intent to discriminate may be found entirely in circumstantial evidence. *See Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982).

Although Defendants argue that there were more effective ways to discriminate and more powerful offices which were not changed to at-large elections, that does not change the fact that Plaintiffs have established that the school board was changed to at-large with a discriminatory intent. Dr. Mormino testified that history is not always simple or neat and that the 1947 legislative session was consumed by the Minimum Foundations Bill. Moreover, Dr. Mormino agreed that if the legislature would have similarly altered the county commissioner structure that it would have been more logical to support Plaintiffs' contention; however, he pointed out that legislatures do not work uniformly and often do not address all related issues at once. In addition, Dr. Mormino agreed that the county commissioners were very powerful individuals and generally have a very strong interest in keeping the system in place which elected them. Any inference that might be drawn from the leg-

---

**5.** According to the 1945 census, Florida's population was twenty-five (25) percent African– American.

islature's inaction, with respect to the county commissioners, is outweighed by the evidence supporting a finding of discriminatory intent with regards to the school board.

■ Nevertheless, the Eleventh Circuit has indicated that discriminatory intent alone is insufficient to establish a violation of § 2 of the Voting Rights Act. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices employed result in unequal access to the electoral process.[6] *See Voinovich v. Quilter,* 507 U.S. 146, 157, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993); *Johnson v. DeSoto County Board of Commissioners,* 72 F.3d 1556, 1561–62 (11th Cir.1996). Therefore, discriminatory results are essential to a vote dilution claim. Furthermore, the Eleventh Circuit emphasized that the plain language of § 2 requires a showing of discriminatory results. *Johnson* at 1563. Accordingly, the Court must determine the consequences of the 1947 Act before ruling on whether there has been a § 2 violation.

■ The finding of intent to discriminate serves as circumstantial evidence of discriminatory results that should be considered in assessing the "totality of the circumstances." *Id.* at 1563, 1565. The burden of showing the prohibited effect is on the Plaintiffs. *Id.* at 1565 (citing to *Voinovich,* 507 U.S. at 155–56). "[E]lectoral devices, such as at-large elections, may not be considered per se violative of § 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process." *Thornburg v. Gingles,* 478 U.S. 30, 46, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

Where it can inferred, as often can be, that the enactors were in a good position to know the effect their actions would have, the fact that the enactment was motivated by a desire to produce discriminatory results will often be strong, albeit circumstantial, evidence that such results were achieved.

*Johnson* at 1565.

■ In order to prove that the 1947 Act resulted in the denial or abridgement of the Plaintiffs' right to vote on account of their race, Plaintiffs can provide evidence that a substantial minority is consistently unable to elect candidates of its choice. *See McMillan v. Escambia County, Florida,* 638 F.2d 1239, 1248 n. 18 (5th Cir.1981). This Court previously held, in error, that the effects of the enactment were unnecessary because discriminatory intent is sufficient to establish a § 2 violation. Nevertheless, the Court discussed Plaintiffs' proof of "minimal" effects which is a relevant starting point in light of the Eleventh Circuit opinion and the Court's finding above.

Plaintiffs' evidence of past discrimination and the current status of African–Americans in DeSoto County must be considered in conjunction with and relation to the present day effects evidence. A few examples of present day effects include: 1) there has never been an African–American candidate for the Board of Commissioners; 2) only two African–Americans have run for county-wide public office in DeSoto County, losing both times; 3) there have been no African–American applicants for DeSoto County Administrator or County Attorney, and no African–American has served in either capacity (Docket No. 64 pgs. 29–30); 4) 75% of African–Americans who are school board employees are aides or service workers; 5) African–American full-time school board employees have decreased in number each year between 1987–90 (Joint Pretrial Memorandum, pgs. 115–116).

---

**6.** Defendants argue that after the Court finds discriminatory intent, then the burden shifts to Defendants to prove that the same decision would have resulted had the impermissible purpose not been considered. The Court disagrees. "[P]laintiffs in § 2 cases ... who prove discriminatory results do not have to show discriminatory intent." *Johnson* at 1560 n. 3. However, once intent is established, it can be used as circumstantial evidence in determining the effects of the decision under a totality of the circumstances analysis. Therefore, it makes no sense for Defendants to argue that the decision would have resulted anyway if the decision still has a discriminatory effect.

*Johnson v. DeSoto County Bd. of Com'rs,* 868 F.Supp. 1376, 1380 (M.D.Fla.1994). This Court opined that, "[t]his evidence is more than minimally sufficient, in combination with Plaintiffs' proof of discriminatory intent to establish a § 2 violation." *Id.*

 The Court has reviewed Defendants' objections to the magistrate's R & R (Docket No. 176), and Plaintiffs response thereto (Docket No. 179). The Court finds that the magistrate judge adequately addressed the evidence provided by the Defendants and the record supports the magistrate's findings. Moreover, the Court finds the Plaintiffs' response persuasive. Nevertheless, the parties have not had the opportunity to sufficiently address the issue of discriminatory results. The Court will not revisit the issue of discriminatory intent. It is merely circumstantial evidence to be considered when considering the totality of the circumstances. Moreover, Plaintiffs in § 2 cases who prove discriminatory results do not have to prove discriminatory intent. Although the Court finds that Plaintiffs have sufficiently carried their burden with discriminatory intent, the issue of discriminatory results must be confronted in greater detail. Accordingly, it is

**ORDERED** that the Plaintiffs shall have ten (10) days from receipt of this Order to file a brief with the Court with regards to evidence probative of the discriminatory results in DeSoto County caused by the 1947 enactment. Defendants shall have ten (10) days from the filing date of Plaintiffs' brief to file a response.

1. Fla. Stat. § 230.08 provides as follows:
 **Nomination in primary elections**
 Each political party holding a primary election during any election year shall nominate one nominee for membership on the school board from each school board member residence area from which a member is to be elected. The nomination from each school board member residence area shall be by vote of the qualified electors of the entire district.

2. Fla. Stat. § 230.10 provides as follows:
 **Election of board by districtwide vote**
 The election of members of the school board shall be by vote of the qualified electors of the entire district. Each candidate for school board member shall, at the time he qualifies, be a resident of the school board member

*REPORT AND RECOMMENDATION*

SWARTZ, United States Magistrate Judge.

This Cause is before the Court on remand from the Eleventh Circuit Court of Appeals. Pursuant to the Order of Referral (Doc. 135) entered by the Honorable Elizabeth A. Kovachevich, Chief United States District Judge, this Court held an evidentiary hearing on October 16, 1996, "to address whether the 1947 at-large system for election of county school boards, Fla. Stat. §§ 230.08 [1] and 230.10 [2] [known as the Minimum Foundations Act] were enacted with the intent to discriminate." [3]

*Procedural History*

The District Court entered a summary judgment in favor of the Defendants relying on the cases of *McMillan v. Escambia County, Fla.,* 638 F.2d 1239 (5th Cir.1981) and *N.A.A.C.P. by Campbell v. Gadsden County School Bd.,* 691 F.2d 978 (11th Cir.1982). In *McMillan* the former Fifth Circuit reviewed the history of Fla.Stat. §§ 230.08 and 230.10 which established the at-large method of electing School Board Officials and found that these statutes were enacted with "invidious racially discriminatory purpose. The Eleventh Circuit relied on the precedent set in *McMillan* when it reviewed a similar challenge in *Gadsden." Johnson v. DeSoto County Bd. of Com'rs,* 868 F.Supp. 1376 (M.D.Fla., 1994). The DeSoto County School Board appealed the District Court's decision.

residence area from which he seeks election. Each candidate who qualifies to have his name placed on the ballot of the general election shall be listed according to the school board member residence area in which he resides. Each qualified elector of the district shall be entitled to vote for one candidate from each school board member residence area. The candidate from each school board member residence area who receives the highest number of votes in the general election shall be elected to the school board.

3. The transcript of the hearing was filed on February 20, 1997 and the parties requested an extension in which to file their closing arguments and briefs which were filed on May 5, 1997.

The Eleventh Circuit reversed the District Court's decision and remanded the case to the District Court first "to determine as a factual matter, based upon the relevant evidence and testimony presented by the parties in this case whether there was discriminatory intent behind the 1947 Act." *Johnson v. DeSoto County Bd. of Com'rs,* 72 F.3d 1556, 1561 (11th Cir., 1996)

*Standards*

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977) The Supreme Court has set forth several possible evidentiary sources for such a determination.

The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. [citations omitted] The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. [citations omitted] ... Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached. The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. *Id.* at 267–268, 97 S.Ct. at 564–565.

*Facts*

At the hearing, the evidence was presented by three experts. Plaintiffs' expert was Dr. Gary D. Mormino, Professor of History, University of South Florida. (Doc. 147) Defen-

dants' experts were Dr. William Rogers, Professor Emeritus, Florida State University and Dr. Stephan Thernstrom, Winthrop Professor of History at Harvard University. (Doc. 141) All of these experts were determined to be qualified to render their expert opinions in this case. Although the Plaintiffs' and Defendants' experts reached far different conclusions, their opinions were based upon, for the most part, the same set of facts regarding the history surrounding the enactment of the 1947 Minimum Foundations Act.

To understand the enactment of the 1947 Minimum Foundations Act, the Court must review the events leading up to that time. (tr. 29) [4] In 1865, the Civil War had ended and Florida was in "flux." (tr. 29) The Florida Constitution enacted in 1865 limited votes to "free white males." (tr. 30) The most notorious aspect of the 1865 Constitution were the "Black Codes" which made disobedience, impudence, even disrespect to the employer a crime. Blacks who wrote labor contracts, could be whipped and sold for up to a year of hard labor. Burglary was punishable by death at the extreme, and particularly it was a constitution designed to exert control over the freed men. *Id.* The 1865 Constitution remained until 1868. (tr. 31) In 1868, the Republicans in the U.S. Congress who were angered by the southern "Black Codes" declared that all constitutions were invalid and mandated that the southern states devise new constitutions. *Id.* The 1868 Constitution extended voting rights to all adult males and centralized power at the governor's office permitting him to use appointments for offices rather than elections. (tr. 31–32) The use of appointments limited the Black voter's effect, especially where Black voters were a majority. (tr. 32–33). During this time, there was great violence in Florida and in the south, including the emergence of the Ku Klux Klan. (tr. 33) In the 1876 election Democrats won. (tr. 34) At that time, "[a]lmost half the state was African American... [approximately] 48%." (tr. 35)

In 1885, constitutional delegates gathered, including 7 African Americans, for a Consti-

---

4. The transcript (Docs.163–168) will be cited as "tr." followed by the applicable page numbers.

tutional Commission. (tr. 36) The outcome of the Commission, was that the governor was no longer able to hold office for two successive terms, there was an elected cabinet, and the governor continued to have appointment power especially in the counties with large African American populations. *Id.* The 1885 Constitution prohibited "all marriages between a white person and a Negro. It authorized the poll tax. It authorized separate but equal schools. And the convention turned down a request for a black normal school." (tr. 37, see also 398) In addition, it created the first "modern public school system, and the county school board emanated from that period in 1889." (tr.40)

In 1889, the Florida legislature enacted poll taxes, abolished Jacksonville, Pensacola and Key West's elected alderman and allowed the governor to appoint new leaders in these positions. (tr. 37–38) In addition, in 1889, the Florida legislature passed legislation requiring 2 years of receipts to vote and the Eight Box law. (tr. 38) The Eight Box Law required a voter to put the ballot in a separate box for each elected office and was enacted with the intention of discouraging illiterate voters which included half of the African American population at that time. (tr. 38) The effect of these laws was dramatic. An estimated 87% of the African American population eligible to vote cast a ballot in 1884 (tr. 35–6), whereas by 1892, only 11% of those eligible voted and by 1896, it was a mere 5%. (tr. 39) The poll tax "was more important to a disfranchisement that anything." (tr. 398) The poll tax under the subterfuge of being a way to raise money was in fact a barrier to voting for blacks and poor whites in that a person had to pay to be able to vote. (tr. 398)

The 1889 Florida Legislature authorized the creation of the first local school boards in Florida, and three school board members were appointed by the State Board of Public Instruction. (tr. 40, pl.ex. 2, p. 7) The State Board of Public Instruction consisted of the Governor, the Secretary of State, the Attorney General, the Treasurer and the Superintendent of Public Instruction. *Id.* Beginning

in 1892, the Democratic Party barred African Americans. (tr. 44) In 1893, school board members were elected rather than appointed by single member districts. (tr. 40) In 1895, the law was changed and the school board was elected by at-large elections and the Australian ballot (a precursor of the ballot in use in today's elections) was introduced which is considered by some historians to be a "defacto literacy test." (tr. 40–41, 400) Also enacted were laws prohibiting any individuals from teaching in an integrated school, the poll tax was repeated, and a five minute limit was set for voters in a voting booth. (tr. 41) The at-large method of elections continued until 1907.

By far, however, the most effective way of eliminating the Black vote in Florida was the enactment of white primaries. (tr. 42, 48, 399) Back in 1892, the Democrats had barred Blacks as members. (tr. 44) If a county chose to hold a primary, it was required to follow the General Laws which required a poll tax. *Id.* In 1897, the Florida legislature permitted the political parties to determine the terms and conditions of party membership. *Id.* In 1901, the power of the party to determine party membership was extended to cover state-wide primaries. (tr. 44) In Arcadia, the city counsel enforced the Democratic Party's ban on Black voters. In addition all of the 1895 legislation such as the poll tax, the Eight Box or the Australian primary ballot system applied to the primaries and reinforced the primaries to be white primaries. (tr. 45) The Florida legislature attempted in 1907 and 1909, to bar Blacks from voting, however, after passing in the senate, these bills failed in the house. (tr. 46) "The most ambitious effort was the grandfather clause of 1915." (tr. 47) Under this legislation, potential voters would be subject to literacy tests and property ownership qualifications. *Id.* This legislation would eliminate many Blacks and poor Whites. *Id.* The legislation required that based on lineal decent, a voter has to be related to someone who voted in January 1, 1867 which would require a Black voter to have a white male relative since Blacks were not permitted to vote in

January 1867. *Id.* This proposed constitutional amendment failed to be passed in 1916. *Id.*

In 1907, important legislation was passed. School board members would now be elected by single member districts in the primaries and at-large elections in the general elections. (tr. 48) In 1915, 1929, and 1939, this system was confirmed. (tr. 49) By 1947, only one county had at-large primaries for school board and that was Leon County. (tr. 535)

In 1944, the case of *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) was decided and in that case, the Supreme Court invalidated Texas' white primary as an infringement of the Fifteenth Amendment. (tr. 50) The reaction by state officials in Florida was concern over their loss of party control. (tr. 53–59) The state Democratic Party recommended segregated polling places possibly in response to *Smith v. Allwright.* Segregated polling places were established in DeSoto County in 1946. (tr. 76, 78–84) The first election after the *Smith v. Allwright* decision was in 1945 and a literacy test requirement was introduced which failed and repealing the primary law also failed. (tr. 59) On January 26, 1946, the Democratic party repealed the white only provision of the party platform, (tr. 314)

In 1945, the Florida Supreme Court invalidated Florida's system of white primaries. *Davis v. State ex rel. Cromwell,* 156 Fla. 181, 23 So.2d 85 (Fla.1945) In 1947, the Florida legislature Senator Matthews, in particular, introduced and discussed a white primary bill but it was defeated. (tr. 92, 93, 422) The reaction to the white primary bill was denunciation from the civil rights community and the community at-large. (tr. 415)

During this time, there was a crises in Florida education. (tr. 431) Florida had an antiquated tax structure, new migrants and a second rate school system. (tr. 94) In 1945, Governor Millard Caldwell appointed a Blue Ribbon Education Study Committee to study Florida's education system. (tr. 94) No African Americans were appointed to this Committee. (tr. 96) The Committee recommended "that there be non-salaried school board members, that the school board members be elected at-large, and that non-partisan primaries in elections be implemented." (tr. 97) The Committee recommended that they needed higher quality board members in terms of education and social and economic status. (tr. 98–99) This Blue Ribbon Committee efforts led to the Legislature's adoption of the Education Reform Act of 1947 also known as the Minimum Foundations Act. (tr. 94, pl.ex. 47)

One of the main purposes of the Minimum Foundations Act was to centralize administration of the funding for schools within a single body in the county. (tr. 294) In particular, the Act brought funding to poor counties. (tr. 186) The goal of the Act was to improve education in the south so that new businesses would consider the south and the native population would have more economic opportunities. (tr. 187) In addition, Governor Caldwell had a genuine interest in raising the quality of the education of Black students through the Minimum Foundations Act. (tr. 203–204) A possible motivation was to discourage the federal courts from charging that public education in Florida was unequal. (tr. 187) At the time, there had been lawsuits by African American teachers suing for equal pay with White teachers. (tr. 187)

Governor Caldwell threatened to veto the Minimum Foundations Act if the method of elections was not changed to at-large elections within the Act. (tr. 197) In the 1940's, the leading method of electing the school boards throughout the nation was by at-large elections. (tr. 627)

*Expert Analysis of the Enactment of the Minimum Foundations Act of 1947*

**Plaintiffs' Expert's Opinion**

The Plaintiffs' expert historian, Dr. Mormino testified that in his opinion the at-large nominations and elections of county school board members in the Minimum Foundations Act of 1947, was racially motivated. (tr. 29, pl.ex. 2, p. 27) Dr. Mormino reviewed the history of the events which lead up to the

1940's. (tr. 29) In 1965, Dr. Mormino found that the southern legislatures in general were bigoted as evidenced by their introduction of the Black Codes. (tr. 30) In addition, the U.S. Congress responded to this type of legislation by dissolving the southern governments. (tr. 31) The Republicans won a majority of the seats in the Florida convention of 1868 (pl.ex. 2, p. 4) and African American predominated the membership in 1868. (tr. 3, 10) but were not the controlling political force. The 1868 Constitution centralized the power in the Governor through permitting the Governor to appoint rather than have elections for key posts. (tr. 32) Through the use of appointments, it was easy for the Governor to limit the effect of newly franchised voters. (tr. 33) Violence continued throughout this period. (tr. 33)

The White Democrats seized power in 1876 within the State of Florida. (tr. 34) As late as 1884, however, 87% of African Americans voted and they were primarily Republicans. (tr. 35) In 1885, however, Florida adopted a new Constitution which Dr. Mormino considered a "white supremacy document" in that it prohibited interracial marriages, authorized a poll tax and established separate but equal schools. (tr. 37) Again through the appointment power, the Governor's office attempted to limit Black influence in elections which was clearly motivated by discriminatory purpose. (tr. 36, pl.ex. 2, p. 7)

In 1889, the Florida legislature created the first local school board which in Dr. Mormino's opinion in light of the racial climate at that time was to preclude the possibility that Black voters in Black-majority counties might elect school board members of their choice. (pl.ex. 2, p. 8) At that time, Blacks continued to vote in substantial numbers. (pl.ex. 2, 8) Also, the use of the poll tax, and the Eight Box Law was to disenfranchise Black voters. (tr. 37, 38) Dr. Mormino testified that in 1895, the Florida legislature along with changing the method of electing members of local boards of public instruction to at-large, the legislature also introduced a new wave of laws aimed at disenfranchising Black voters such as literacy tests and re-

taining poll taxes. (tr. 41) At this time, Dr. Mormino opined that the White legislators were arguing that if they could eliminate the Black vote then they could proceed with political reform. (tr. 43) This idea of progressivism included disfranchisement for Blacks as well as segregation (tr. 42–43) Dr. Mormino testified that the use of at-large elections was a part of the progressive reform. (tr. 43)

Following the beginning of the progressive reform, in 1897, the legislature began authorizing white primaries. (tr. 44) According to Dr. Mormino, the Democratic party now became a private club from which Blacks were excluded. (tr. 44) Dr. Mormino states that the white primary was a drastically effective method of disfranchising African Americans. (tr. 48) Dr. Mormino testified that the changes "from appointive to elected school boards in 1893 and county commissioners in 1900 were done only after disfranchisement was in place and are correctly seen in the same light—as the preferred method but put into place only when whites alone had effective votes." (pl.ex. 2, p. 14)

After the white primaries were in place in 1907, the Florida legislature changed the method of holding primary elections for county school boards from at-large to single-member districts. (tr. 48) Dr. Mormino testified that this 1907 legislation created a situation where in the primary elections (which were in single-member districts with "white only" primaries), the Black voters were barred from voting, yet in the general elections which were at-large and the Black voters could participate, all of the nominees were chosen by white voters. (pl.ex. 2, p. 14) Further, Dr. Mormino finds that the legislatures of 1915, 1929 and 1939 confirmed this system of elections. (tr. 49) Dr. Mormino testified that "[t]he adoption of mandatory district primaries is correctly seen, as are the change from appointive to elective and the adoption of the primary, as part of returning more democratic government to white voters. White Democrats clearly preferred a district election system if they could be sure, as guaranteed by the white primary, that black

voters would not be able to elect candidates of their choice or significantly influence elections." (pl.ex. 2, p. 15)

After *Smith v. Allwright, supra,* which struck down white primaries in Texas in 1944, Dr. Mormino testified that the reaction in Florida was "immediate outrage." (tr. 51) Dr. Mormino found that state officials were quoted opposing the *Smith v. Allwright* decision in newspapers around Florida. (tr. 53) After the 1945 decision in *Davis v. Cromwell, supra,* which struck down Florida's system of white primaries, there were a number of measures introduced in the Florida legislature to deter Black voters including a White Primary Bill as well as a literacy test. (tr. 59, 85–86, pl.ex. 2, p. 16–18) Dr. Mormino opined that these measures were defeated not because of any moderation in Florida's commitment to the racial status quo, but rather because the state's leaders were taking a wait and see approach in that the amount of Black voter registration was down and therefore, the Black voter could be controlled without direct legislation. (tr. 70–71, 58, 62–64, pl. ex. 2 p. 16–18) This theory is a major departure from the Defendants' experts. Dr. Mormino opined that in response to *Smith v. Allwright,* DeSoto County created segregated polling places in 1946 with Arcadia following in 1947, (tr. 75, 78) which were a means of controlling the African American vote. (tr. 71–73)

When Governor Caldwell appointed the Blue Ribbon Education Study Committee in 1945, he did not include any African American members. (tr. 95) Dr. Mormino testified that the recommendations of the committee as to the type of citizen that should be on a school board, namely relatively wealthy, well educated and stable in his social unit, meant that the committee did not have African Americans in mind as board members. (tr. 98, 194–195) Dr. Mormino compared the Blue Ribbon Committees recommendations as to qualifications for board members to those of the qualifications for juror which excluded virtually all African Americans from jury pools. (pl.ex. 2, p. 25–26) One of the recommendations of the Blue Ribbon Committee

was at-large elections for primaries for school board members. (tr. 197) Dr. Mormino opined that since Governor Caldwell was willing to veto the Minimum Foundations Act if at-large elections were not included, then Governor Caldwell's motivation for supporting the Minimum Foundations Act of 1947 was to control race relations through this Act. (tr. 201) According to Dr. Mormino, Governor Caldwell was willing to spend more money on the education of African Americans in order to control them, (tr. 203, pl. ex. 450 p. 2) and that a motivating factor for the 1947 Minimum Foundation Bill was to upgrade African American schools to avoid any federal court charging that public education in Florida was not equal. (tr. 186–187) Lawsuits had been brought successfully in Florida for equal pay for African Americans and Dr. Mormino testified that it was these types of lawsuits and not racial moderation which motivated the legislature to fund African American schools. (tr. 187–194) In addition, although the Minimum Foundations Act added funding to African American schools, it did not equalize funding between White and Black schools. (tr. 202–203) Dr. Mormino testified that in his opinion the 1947 legislation which changed the method of electing county school boards to at-large nomination was racially motivated based on the history of the Florida legislature and had nothing to do with racial moderation. (tr. 29, 206–207) Bolstering his opinion, Dr. Mormino testified that in 1959, not one of Florida's county school systems was integrated. (tr. 207) Dr. Mormino concluded that "as long as black voters were/are effectively eliminated, the Florida legislature preferred single member districts; as soon as blacks began to register in more than minimal numbers, the system of at-large elections provided a guarantee of white rule." (pl.ex. 2, p. 27)

The Plaintiffs argue that the Defendants experts' opinion that the change to at-large school board primaries was not racially motivated because there was no public outcry against such racially discriminatory legislation is incorrect in that there was not public outcry when the legislature tried to save

Florida's white primary system which was obviously racially motivated. (tr. 340–341) Further, the Plaintiffs cite the Defendants' expert Dr. William Rogers who admitted that the 1947 legislature was composed of "diehard segregationists." (tr. 452–453), and also admitted that if the Florida legislature had not changed to at-large elections in the primaries in 1947, that in some counties, African American voters would have controlled. (tr. 454) In addition, Plaintiffs argue that the Defendants' other expert, Dr. Thernstrom admitted that the 1947 legislature was committed to maintaining the racial status quo. (tr. 710–712)

The Plaintiffs assert that the 1947 Minimum Foundations Act was not enacted by a legislature with a clean slate in that many times in the past 70 years, the legislature had attempted to disfranchise Black voters. The Plaintiffs argue that there is a strong presumption that the Florida legislature' would enact legislation continuing to exclude Black voters from participation. The change in legislation, the Plaintiffs' argue was simply to maintain the status quo regarding race in the elections.

### Defendants' Expert Opinions

The Defendants argue that the Plaintiffs have no direct evidence that the Florida Legislature was motivated by racial factors in enacting the at-large elections for county school boards in 1947. (tr. 449–350) In addition, the Defendants argue that the Plaintiffs have failed to show that in 1947, there was anyone of any race who objected to the at-large elections or who commented that this change was a means to limit Black political participation.

The Defendants argue that obviously the preferred method of election from 1907 through 1947 were single member district nominations. Both sides agree that African Americans were removed as a political force by 1890. (tr. 245, 401) However, the Plaintiff's expert asserted that the switch to at-large elections came about when African Americans were once again permitted to participate in all elections. At-large elections, however, were occurring from 1895 through 1907 in some counties which was during the time that African Americans were disfranchised. (tr. 401–403) Dr. Rogers testified, however, that after school boards were no longer appointed, the legislatures were switching from at-large to single district elections to determine which method was a better. (tr. 402–403)

The Defendants' argue that the change to at-large elections was not found in an elections law bill but rather in a bill that focused on educational reforms. (tr. 94, 389) In addition, the bill introduced by Senator Matthews to get around the *Smith v. Allwright* decision received no support. (tr. 59, 70) Also, the Plaintiffs provided no evidence that anyone objected to the at-large elections portion of the bill, and yet there were many comments regarding other aspects of the Minimum Foundations Act and other legislature at the time. (tr.326–327, 447) In addition, minorities supported the Minimum Foundations Act, (tr. 431–432) and, Senator Matthews who supported white primaries did oppose the Minimum Foundations Act, however, he did vote for it. Senator Johns, however, who was considered a racist opposed the Act. (tr. 438–439, 568–569) Both parties experts agreed that the Minimum Foundations Act was enacted to overhaul the tax structure (tr. 94), and the Defendants argue that at-large elections will give the candidates a countywide prospective regarding implementing the taxes. (tr. 641–642) Dr. Thernstrom opined that at-large elections were logical given the legislature's vision of a more centralized school district. (tr. 649–650) Furthermore, if the legislature was intent on enacting laws to disfranchise African Americans, and the legislature believed that at-large primaries were the method to do this, then the Defendants argue that the legislature would have enacted a similar statute for county commissioners being that a county commissioner is one of the most powerful positions in county government. (tr. 650)

Next, the Defendants argue that Dr. Mormino's description of the atmosphere and the political situation in 1947 is at odds with

**1458**

other leading experts of southern politics. The Defendants relied on the opinion of V.O. Key who both of the Defendants' experts described as a great scholar and observer during this period. (tr. 579, 623) V.O. Key found that Florida was "scarcely a part of the South" in that Florida's population lived in the cities rather than living in the country and being mainly agricultural. (tr. 623–624) The Defendants also refer to H.D. Price who stated that Blacks obtained political rights much faster in Florida than in other southern states. (Doc. 141, p. 19) V.O. Key stated that after *Smith v. Allwright* some people expressed their dissent, but the state made no institutional changes in any attempt to retain the white primary, and the Democratic Party removed its "whites only" provision. (tr. 314) The Defendants argue that these scholars wrote their opinions around the time of the enactment of the Minimum Foundations Act, and therefore, their opinions should have great weight. In addition, during this time, Florida attracted African American whereas African Americans in other southern states were fleeing. (tr. 625)

Regarding the implementation of separate voting places for Whites and Blacks (tr. 64), the Defendants argue that in the context of 1946 in Florida such segregation could have been a means to accommodate Black voters and lessening the opportunity for racial conflict. (tr. 723–725)

The Defendants' rely on the fact that after *Smith v. Allwright,* the Legislature refused to enact legislation to avoid or evade this ruling. (tr. 207) Both of Defendants' experts found that the lack of any legislation on this issue highly probative of the attitudes concerning Black voting. (tr. 424–425, 651). The Defendants' experts agree that the lack of any legislation along with the defeat of the Matthews bills which attempted to evade the Supreme Court's rulings shows that the people of Florida were becoming "right thinking people, people who wanted Florida to be less like other Southern states and more into the main stream of American life."(tr. 422) The Florida legislature gave up "white primaries" without a fight. (tr. 681–682) The Defen-

dants' experts claim that Florida had outgrown "this sort of nonsense by the post war period" and if the legislators wanted to continue trying to prohibit or limit African Americans from voting, the legislature should have immediately enacted a literacy requirement as opposed to "tinkering around with the mode of election to the school board..." (tr. 651–652) In fact, other southern states did attempt to avoid *Smith v. Allwright* and other such decisions and these states were embroiled with intense federal litigation which Florida avoided. *See, State of S.C. v. Katzenbach,* 383 U.S. 301, 311–313, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)

Further, the Defendants' experts argue that at-large elections in school board primaries cannot be seen as a substitution for White primaries. (tr. 652) Defendants' experts state that first, school boards are not central to county governments and second, Defendants' experts did not agree that at-large elections disadvantaged minority voters. (tr. 652–653) In addition, the Defendants argue that if the legislature wanted to replace "white primaries," the place to replace them would be with the more powerful government positions and not with the school board. Further, the Defendants argue that the Plaintiffs have provided no evidence that in 1947 in Florida that if the single member districts remained in place for the primaries that African Americans would have been nominated more so than with at-large elections. The Defendants' argue that it is as possible that African American voters would have preferred to have influence over all of the candidates in at-large elections rather than be able to nominate one African American to a school board where all the other members are White. (tr. 653–654) Overall, the Defendants and their experts argue that there were more effective ways of limiting the African American influence in elections such as gerrymandering, requiring a literacy test or abolishing school board elections and replacing elections them with appointed positions rather than enacting at-large elections. (tr. 404–405) In other southern states, school board were appointed and were the

norm whereas northern states required elected school boards. (tr. 637)

The Defendants argue that the Plaintiffs failed to provide evidence that race played any role in the Florida Legislature's adopting of at-large nominations for school boards. In addition, the Defendant's argue that the Plaintiffs failed to show that race was a predominant, substantial or motivating factor.

### Court's Analysis

The Eleventh Circuit in this case held that [O]n remand, it will be necessary for the district court to determine as a factual matter, based upon the relevant evidence and testimony presented by the parties in this case, whether there was discriminatory intent behind the 1947 Act. *Johnson v. DeSoto County Board of Commissioners*, et. al., 72 F.3d 1556, 1561 (11th Cir.1996).

We must therefore look at the evidence produced in this case through the standard set by *Village of Arlington Heights v. Metropolitan Housing Development Corp.* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977) to determine if discrimination was a motivating factor for the enactment of the 1947 act. In looking at the history of Florida, there can be no doubt that Florida, like every other southeastern state followed a path of strict racial separation and discrimination. It is clear from its history that the Floridian leaders passed many varied types of legislation, both statewide and local to control former Black slaves and to continue White domination, from the end of the Civil War in 1865 to 1947 and beyond.

Without reiterating all of the history previously stated herein, this Court would point out that Plaintiffs and Defendants agree as to the early Florida history, and it is only when they approach the date of the enactment of the 1947 Minimum Foundations Act, do their experts' opinions differ as to the reasons and purposes for the enactment of the 1947 Act. This Court finds that one purpose or intent of the Act was to discriminate against Black minority voters.

The following events leading up to the 1947 School Board Act convince this Court of a discriminatory intent. In 1944, the Supreme Court invalidated the Texas white primary as an infringement of the Fifteenth Amendment, in the case of *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944). The reaction in Florida was outrage and concern over the loss of party control and many of the state officials were quoted in various newspapers as opposing the *Smith v. Allwright* decision. The state Democratic Party therefore recommended segregated polling places which were established in both DeSoto County and the City of Arcadia during the years of 1946 and 1947.

In 1945, the Florida Supreme Court invalidated Florida's system of white primaries in *Davis v. State ex.rel. Cromwell,* 156 Fla. 181, 23 So.2d 85 (1945), and on January 26, 1946 the Democratic Party repealed the white-only provision of the party platform. During this same period of time, Florida was going through a crisis in its education system. Florida had an antiquated tax structure, new migrant citizens migrating from the north, and a second rate school system. The then elected Governor Willard Caldwell appointed an all-white Blue–Ribbon Education Study Committee to study Florida's education system. The committee recommended that there be non-salaried school board members, that the school board members be elected at-large, and that non-partisan primaries be implemented, and that they needed higher quality board members in terms of education and social status. No black school board members were obviously contemplated by the committee. Governor Caldwell threatened to veto the 1947 Act if the method of elections was not changed to at-large elections, although legislation was enacted in 1907 providing for single districts primary elections for school board members and by 1947 only one county in Florida had an at-large primary.

The Defendants argue that the Plaintiffs have no direct evidence that the Florida Legislature was motivated by racial factors in enacting the at-large elections for school

boards in 1947, although Defendant's expert Dr. Rogers admitted that the 1947 legislature was composed of "diehard segregationists", and Defendant's other expert Dr. Thernstrom admitted that the 1947 legislature was committed to maintaining the racial status quo.

The Defendant's experts argue that the 1947 Minimum Foundation Act was enacted to overhaul the tax structure and that at-large elections gives the candidates a county wide prospective regarding implementing the taxes. In addition, Defendant's argue that Florida was scarcely a part of the South, in that the people of Florida were becoming right thinking people who wanted Florida to be less like other Southern States and more into the main stream of American life.

While this Court agrees with the Defendants that the 1947 Act was enacted to upgrade the school tax structure and the Florida education system as a whole for the benefit of the Whites and the Blacks, this Court is also convinced that the Act was enacted as a result of the Supreme Courts ruling in *Smith v. Allwright*, supra. Governor Caldwell and the Florida Legislature desired to continue their control over the Black voters both by the dilution of the Black vote by the at-large elections, and to fend off the federal courts by upgrading the black schools to avoid any federal court charging that public education in the Florida schools was not equal. To achieve this end, Governor Cromwell was willing to spend more money on the education of blacks in order to control them. While the enactment of the 1947 Act may have been for legitimate educational purposes as well as discriminatory purposes, the law does not require a Plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

Based upon the evidence and testimony presented by all parties, it is respectfully recommended that the District Court find that Plaintiffs have sustained their burden of

establishing that the 1947 at-large system for election of county school boards, Fla.Stat. §§ 230.08 and 230.10 were enacted with the intent to discriminate.